# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON
_____

| | | |
|---|---|---|
| | ) | |
| **MELANIE MILLER, individually and** | ) | Shelby County Circuit Court |
| **as Next Friend for ASHLEY MILLER** | ) | No. 54181 T.D. |
| **LUNA, a minor, and Next Friend of** | ) | |
| **GREGORY LUNA, deceased**, | ) | |
| | ) | |
| Plaintiffs/Appellants. | ) | |
| | ) | |
| VS. | ) | C. A. NO. 02A01-9505-CV-00101 |
| | ) | |
| **GARY D. NIBLACK, M.D.,** | ) | |
| **LABORATORY INVESTMENTS, INC.,** | ) | |
| **and REN LABORATORIES, INC.** | ) | |
| **d/b/a REN HISTOCOMPATIBILITY** | ) | |
| **LABORATORY, A Joint Venture, and** | ) | |
| **JOHN DOE**, | ) | |
| | ) | |
| Defendants/Appellees. | ) | |
| | ) | |

FILED

October 9, 1996

Cecil Crowson, Jr.
Appellate Court Clerk

_____

From the Circuit Court of Shelby County at Memphis.
**Honorable William O'Hearn, Judge by Designation**

**Lynda F. Teems**, Memphis, Tennessee
Attorney for Plaintiffs/Appellants.


**J. Cecil McWhirter**, Memphis, Tennessee
**Sally F. Barron**, Memphis, Tennessee
Attorneys for Defendant/Appellee, Laboratory Investments, Inc.


**James E. Moffitt,**
**Reid D. Leitner**,
LEITNER, WARNER, MOFFITT, WILLIAMS, DOOLEY, CARPENTER
& NAPOLITAN, Nashville, Tennessee
Attorneys for Defendnat/Appellee, Ren Laboratories, Inc.

OPINION FILED:

**REVERSED IN PART, AFFIRMED IN PART AND REMANDED**


**FARMER, J.**


**CRAWFORD, P.J., W.S.** : (Concurs)
**LILLARD, J.** : (Concurs)

This is an action for negligence in the conducting of a paternity test. The trial court entered summary judgment in favor of the appellees, Gary D. Niblack, M.D., Laboratory Investments, Inc. and Ren Laboratories, Inc. d/b/a Ren Histocompatibility Laboratory, a joint venture, and John Doe. The appellants, Melanie Miller, individually and as next friend for Ashley Miller Luna, a minor, and next friend of Gregory Luna, deceased, have appealed presenting the single issue of whether the trial court erred in doing so. For reasons hereinafter set forth, we affirm in part and reverse in part the judgment of the trial court.

On October 30, 1990, Melanie Miller gave birth to a baby girl, Ashley. On May 22, 1991, Ms. Miller filed a petition to establish paternity against Gregory Luna in juvenile court. The court, "upon motion of the state," ordered the parties to submit to blood tests. A paternity blood test was performed by Ren Histocompatibility Laboratory (RHL), where Dr. Niblack is employed as its director. RHL provided these services pursuant to its contract with the juvenile court of Memphis and Shelby County. The results of the test, which excluded Luna as the natural father of Ashley, were submitted to the court who dismissed the petition on June 4, 1991, "due to [Luna] having been excluded by blood tests." Luna died on February 18, 1992. On June 16, 1992, Miller filed a petition to establish the paternity of Ashley against Randall Carter in the juvenile court. The court ordered the parties to submit to blood tests which were once again performed by RHL. The tests excluded Carter as the father. The results of the tests were released to the juvenile court by letter dated September 9, 1992. The court dismissed Miller's petition on September 15, 1992.

On February 1, 1993, Miller filed a "Motion for Relief from Judgment," asserting that on September 27, 1992, she discovered the results of a blood test repeated on herself and the child indicating that there was a "mix-up" on the earlier test results and that Luna was in fact Ashley's father.[1] Blood tests were then performed by RHL[2] on Ms. Miller and Ashley and on Luna's parents, to confirm the accuracy of Luna's prior blood data. After a hearing which revealed the new test results, the trial court found Luna the natural father of Ashley and ordered its prior judgment of June

_____

[1]The test results, signed by Dr. Niblack, state that "[Luna] can not be excluded as the father of Ashley Miller. The combined paternity index (genetic odds in favor of paternity) is 21.38. The relative chance of paternity is 95.53%."

[2]At this time, the business actually operated under the name Gene Proof Technologies. Dr. Niblack remained its director.

4, 1991 "set aside as having been based upon an incorrect testing result." The court ordered that the surname of the child be changed to Luna and that she be considered legitimate for purposes of inheritance and support.

On June 2, 1993, Appellants filed the present action alleging that Appellees deviated from the recognized standard of care in failing to properly test the blood products and report the actual paternity of the child. Appellants alleged that Miller learned the test results excluding Luna as the father of Ashley were erroneous on September 9, 1992.[3] Appellees denied all material allegations and moved for summary judgment or, in the alternative, for partial summary judgment, asserting that the complaint was barred by the doctrine of judicial immunity, the public duty doctrine and the applicable one year statute of limitations. It was further asserted that Luna's cause of action abated upon his death; that Ashley Luna lacked standing to sue as "next friend" of Luna; that Miller and Ashley Luna had suffered no actionable damages; and, finally, that Appellants could not recover "hedonic" damages. In support thereof, Appellees relied upon various depositions,[4] the affidavit of Wendy Durand and Appellants' responses to interrogatories and requests for production of documents. Appellants responded to the motion by filing a memorandum wherein it was argued that "there are numerous issues of material fact involved in this record . . . ." However, no discovery materials were specifically introduced or expressly relied upon by Appellants in opposing the motion.

It is well established that the party seeking summary judgment bears the burden of persuading the court that no genuine and material factual issues exist and it is, therefore, entitled to judgment as a matter of law. *See, e.g., Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). In reviewing motions for summary judgment, we are to view the evidence in a light most favorable to the nonmoving party, allow all reasonable inferences in that party's favor and discard all countervailing evidence. It is only when there is no disputed issue of material fact that summary judgment should be granted by the trial court and sustained by the court of appeals. *Byrd*, 847 S.W.2d at 210-11; *Fly v. Cannon*, 813 S.W.2d 458, 460 (Tenn. App. 1991).

---

[3]The complaint inadvertently reads "1993."

[4]Specifically, these are the depositions of Miller, Luna's parents, Donna Stoker, Laurie Austin and Pamela Medkiff.

The trial court's order granting summary judgment in favor of the appellees fails to set forth its specific reason(s) for doing so. Therefore, we will consider each assertion raised by the appellees in their motion. We first consider whether Luna's cause of action abated upon his death. T.C.A. § 20-5-102 provides:

> **Actions surviving death of party**. -- No civil action commenced, whether founded on wrongs or contracts, except actions for wrongs affecting the character of the plaintiff, shall abate by the death of either party, but may be revived; nor shall any right of action arising hereafter based on the wrongful act or omission of another, except actions for wrongs affecting the character, be abated by the death of the party wronged; but the right of action shall pass in like manner as the right of action described in § 20-5-106.

T.C.A. § 20-5-106 states, in part pertinent:

> **Injury resulting in death -- Succession to cause of action -- Beneficiary who is minor or legally incompetent. --** (a) The right of action which a person, who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another, would have had against the wrongdoer, in case death had not ensued, shall not abate or be extinguished by the person's death but shall pass *to the person's surviving spouse and, in case there is no surviving spouse, to the person's children or next of kin*; (emphasis added).

The record establishes that Luna is survived by his spouse, Audrey Cook Luna. In accordance with the foregoing statutes, we find that if any action exists on behalf of the deceased, it is properly maintained only by his surviving spouse. As such is not the case here, we find that the suit pursued on behalf of Luna by his daughter Ashley as "next friend" should be dismissed. We hold that summary judgment was properly granted to the appellees as to this cause of action.[5]

We next consider the assertion that the present claims are barred by the doctrine of judicial immunity. It is contended that Appellees are the duly authorized agents of the juvenile court and are entitled to judicial immunity from liability for their acts as judicial officers under the direction of the juvenile court.

---

[5]For clarity, any future reference to "Appellants" throughout this opinion will be in regard to Miller and Ashley Luna.

The doctrine of absolute judicial immunity, which first arose under common law, has been extended to persons, other than judges, performing judicial or quasi judicial functions. *LaLonde v. Eissner*, 539 N.E.2d 538, 540 (Mass. 1989); *Howard v. Drapkin*, 271 Cal. Rptr. 893, 901 (Cal. Ct. App. 1990); *Harris v. Brustowicz*, 671 So.2d 440, 443 (La. Ct. App. 1995). In *LaLonde*, a mother and child brought suit against a court appointed psychiatrist to recover for the allegedly negligent evaluation rendered by the doctor to the court, causing a continuation of the father's visitation privileges. *LaLonde*, 539 N.E.2d 538. The psychiatrist argued that he was entitled to quasi judicial immunity because he had been court appointed. *Id*. at 539. The Massachusetts Supreme Court agreed and affirmed the trial judge's ruling, affording the psychiatrist absolute judicial immunity. *Id*. The court reasoned:

> Courts have expanded the doctrine of absolute judicial immunity to include these "quasi judicial" officers because they are involved in an integral part of the judicial process and thus must be able to act freely without the threat of a law suit. *Robichaud v. Ronan*, 351 F.2d 533, 535-538 (9th Cir. 1965). When acting at a judge's direction, these "quasi judicial" officers enjoy the same absolute immunity for their conduct. *Temple v. Marlborough Div. of the Dist. Court Dep't, supra*, 395 Mass. at 133, 479 N.E.2d 137 (court clerk).
>
> . . . . Most jurisdictions have held that common law immunity protects persons appointed by a court to conduct a medical or psychiatric evaluation and render an opinion or to provide other expert assistance because of their integral relation to the judicial process. *See, e.g., Moses v. Parwatikar*, 813 F.2d 891, 892 (8th Cir.), cert. denied. ____ U.S. ____, 108 S.Ct. 108, 98 L.Ed.2d 67 (1987) psychiatrist); *Myers v. Morris*, 810 F.2d 1437, 1467 (8th Cir.), cert. denied, ___ U.S. ___, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987) (therapists in child sexual abuse case); *Burkes v. Callion, supra* at 319 (psychiatrists); *Bartlett v. Weimer*, 268 F.2d 860, 862 (7th Cir. 1959), cert. denied, 361 U.S. 938, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960) (physicians); *Williams v. Rappeport*, 699 F.Supp. 501, 507-508 (D.Md.1988) (psychiatrist and psychologist appointed during custody determination); *Miner v. Baker*, 638 F.Supp. 239, 241 (E.D.Mo. 1986) (psychiatrist); *Doe v. Hennepin County*, 623 F.Supp. 982, 986 (D.Minn.1985) (therapists in child sexual abuse case); *Phillips v. Singletary*, 350 F.Supp. 297, 300 (D.S.C.1972) (physician); *Bartlett v. Duty*, 174 F.Supp. 94, 97-98 (N.D.Ohio 1959) (physician). These courts recognized that "[p]sychologists and other experts would be reluctant to accept court appointment if they thereby opened themselves to liability for their actions in this official capacity." *Doe v. Hennepin County, supra* at 986. *Moses v. Parwatikar, supra* at 892. Also, human nature indicates that court-appointed experts, faced with the threat of personal liability, will be less likely to offer the disinterested objective opinion that the court seeks. *Id*.

*Id*. at 540-41.

In *Howard v. Drapkin*, a child custody case, the court held that a psychologist ordered by the court to evaluate the family and render her findings and recommendations was entitled to absolute quasi judicial immunity in a suit by the parents alleging, *inter alia*, professional negligence. *Howard*, 271 Cal. Rptr. at 895, 905. *Howard* held that in order to determine whether an individual has quasi judicial immunity, the connection between that person's activity and the judicial process is to be evaluated, rather than the status of the individual. *Id*. at 898. The court further held that as is the reason for granting judicial immunity, quasi judicial immunity is extended "to promote uninhibited and independent decision making." *Id*.

A different result was reached by the Louisiana Court of Appeals in *Harris v. Brustowicz*. There, parents filed suit against the coroner and coroner's office for the alleged wrongful death of their son in failing to issue an order of protective custody after agreeing to do so. *Harris*, 671 So.2d at 440-42. The issue before the court was whether the defendants were entitled to judicial immunity. *Id*. at 441. In holding the defendants subject to liability for their alleged actions, the court stated:

> Under the doctrine of judicial immunity, a judge is entitled to absolute immunity from liability for acts he performs in his judicial role which are integral to the judicial process. . . .
>
>    . . . .
>
> The Supreme Court [in *Forrester v. White*, 484 U.S. 219, 225 (1988)], held that immunity was "justified and defined by the functions it protects and serves, not by the person to whom it attaches." . . . In this context, the Court drew a distinction between judicial acts and administrative or executive acts, noting that the latter have not been recognized as judicial acts warranting immunity, even though essential to the functioning of the courts. . . . Further, the Court indicated recognition of such immunity should be sparing, in view of the fact that absolute immunity is "strong medicine." . . .
>
> Nevertheless, quasi-judicial immunity has been extended in some instances to nonjudicial persons fulfilling quasi-judicial functions intimately related to the judicial process. . . . The determinative factor is whether the person performs a judicial function with an integral relationship to the judicial process. . . .
>
> In the present case, plaintiffs do not complain of the exercise of the coroner's judgment resulting in a decision to deny the request for a protective order. Rather, the basis of plaintiffs' claims is the allegation that the coroner failed to personally review the request for protective order and make any decision thereon, failed to provide adequate procedures for the handling of such requests by a well-trained staff, failed to supervise his staff, and delegated responsibility

for the handling of such requests to unqualified, nonmedical personnel. In the alternative, plaintiffs contend the corner's office was negligent and acted in bad faith in failing to expeditiously take Rogowski into custody after agreeing to do so. We find that the alleged acts and omissions are not judicial functions integral to the judicial process, but are primarily administrative, executive and/or operational in nature.

*Id*. at 442-43 (citations omitted).

In the instant matter, the affidavit of Wendy Durand states, as here pertinent:

On January 16, 1991, the Memphis Juvenile Court and Shelby County entered into a contract for services with REN Laboratories, also known as REN Histocompatibility . . . . Under this contract, REN Histocompatibility was to provide all paternity blood testing for the Memphis Juvenile Court. In May-June, 1991, REN Histocompatibility performed for the Memphis Juvenile Court approximately 50 sets of blood tests per week. The blood samples from the testee was [sic] drawn at the Memphis Juvenile Courthouse, and transported to Nashville, Tennessee for testing at the REN Histocompatibility Laboratory. REN furnished its test results to the Juvenile Court in the form of a written report.

On April 16, 1991, [Miller] brought against [Luna] a Petition with the [Court] to establish the paternity of her daughter, . . . At a preliminary hearing . . . Juvenile court Referee . . . ordered . . . that upon motion of the State all parties submit to blood tests administered by the Memphis Juvenile Court.

The contract, attached to Durand's affidavit, indicates:

The Lab will perform testing on Red Blood Cell Antigens (RBC) on all individuals referred for testing. If upon completion of testing of RBC, there is a direct exclusion or multiple indirect exclusions, unless otherwise instructed, the Lab will discontinue testing. However, in case where the specimens from the parties do not arrive in the Lab on the same day, the Lab will perform RBC and Human Leukocyte Antigen (HLA) procedures on all partial cases submitted.

If upon completion of RBC, there is no direct exclusion or multiple indirect exclusions, the Lab will perform HLA testing.

If upon completion of RBC and/or HLA, the probability of paternity is less than 99%, the Lab will extend testing using serum proteins, red cell enzymes and/or DNA Probe. If, after performing all testing, the probability of paternity is less than 99%, there will be no charge for any services provided.

We find the contract between RHL and the Juvenile Court exact in its requirements of RHL in performing the blood tests. There is no room for discretion as to the type of tests to be performed or the order in which they are conducted. Moreover, the test results are not subject to different interpretation. They either exclude the alleged father or do not. This is directly opposite to the aforementioned cases concerning psychologists or psychiatrists who were appointed by the court to conduct an "evaluation." Here, the tasks of RHL did not lend themselves to "uninhibited and independent decision making."

We believe the facts of our case are more closely aligned to those in *Harris*. As in *Harris*, the appellants here do not question Appellees' decision regarding whether or how the tests were to be conducted. The appellants allege negligence in the appellees' actual performance of the tests. "Immunity can only exist where the defendant official is required to exercise some modicum of official discretion . . . . since the rationale for official [quasi judicial] immunity is the promotion of fearless, vigorous, or effective administration of policies of government, the qualification of immunity which limits it to discretionary acts is eminently practical." 63 Am. Jur. 2d *Public Officers and Employees* § 362 (1984). We conclude that the record before us does not establish that Appellees are entitled to judicial immunity as a matter of law.

Appellees also assert that the present action is barred under the public duty doctrine. They contend that they performed the subject blood tests as a public officer for the purposes of the public duty doctrine. They point to the fact, as found in Durand's affidavit, that the tests were authorized and paid for by the juvenile court and that all test results were reported directly to the court. They argue that as a public officer, their duty was to the public at large, not the appellants in particular.

The public duty doctrine shields a public employee from suits for injuries that are caused by the public employee's breach of a duty owed to the public at large. *Ezell v. Cockrell*, 902 S.W.2d 394, 397 (Tenn. 1995). *Ezell* recognized that the doctrine survived enactment of Tennessee's Governmental Tort Liability Act and that sound public policy warrants its continued application. *Ezell*, 902 S.W.2d at 404. In *Bennett v. Stutts*, 521 S.W.2d 575 (Tenn. 1975), our supreme court held:

> Public wrongs or neglect or breach of public duty generally cannot be redressed at a suit in the name of an individual or individuals whose interest in the right asserted does not differ from that of the public generally, or who suffers injury only in common with them generally, and not peculiar to himself, even, it seems, though his loss is greater in degree, unless such right of action is given by statute.

*Bennett*, 521 S.W.2d at 577 (quoting 59 Am. Jur. 2d *Parties* § 30).

As its definition would imply, the doctrine is subject to a "special-duty" exception. The *Ezell* court held that a special duty of care exists, rendering the doctrine inapplicable, where:

> 1) officials, by their actions, affirmatively undertake to protect the plaintiff, and the plaintiff relies upon the undertaking; 2) a statute specifically provides for a cause of action against an official or municipality for injuries resulting to a particular class of individuals, of which the plaintiff is a member, from failure to enforce certain laws; or 3) the plaintiff alleges a cause of action involving intent, malice, or reckless misconduct.

*Ezell*, 902 S.W.2d at 402.

In his deposition, Dr. Niblack attempts to explain the different test results by stating that the samples were "switched from one report to the other, so that the mother's report is listed as the child's report and vice versa." We believe there was an affirmative undertaking by Appellees to accurately record the blood tests of Appellants and that Appellants were justified in relying upon Appellees to do so. Appellants do not question the manner in which the lab generally performs its tests or the specific procedures utilized or followed, but their alleged negligence in "switching" the specific test results of Appellants. The injury involved here is peculiar to Appellants. We conclude that the record fails to establish the appellees' entitlement to immunity from suit under the public duty doctrine.

Appellees next assert that the present action is barred by the one-year statute of limitations. T.C.A. § 28-3-104 provides that actions for "injuries to the person" are to be commenced within one year after the cause of action accrues. Under the discovery rule, the cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered,

or when in the exercise of reasonable care and diligence, it should have been discovered. *E.g.,*
***Woods v. Sherwin-Williams Co.***, 666 S.W.2d 77, 78 (Tenn. App. 1983). The rule applies only when
the plaintiff does not discover and could not be reasonably expected to discover that he has a right
of action. It does not allow the plaintiff to wait until he knows all of the injurious effects or
consequences of the tortious act. Moreover, the statute is tolled only during the period when the
plaintiff has no knowledge at all that a wrong has occurred and, as a reasonable person, is not put
on inquiry. ***Woods,*** 666 S.W.2d at 80.

Appellees argue that Miller had either actual knowledge or was put on inquiry notice
of her alleged injuries on June 4, 1991 - the day her petition against Luna was dismissed by the
juvenile court. The record establishes that during the critical time period, Miller had sexual relations
with only Luna and Carter. She had sexual intercourse with Carter only one time on February 26,
1990. The child was not born prematurely. In her deposition, Miller states that she believed herself
pregnant prior to having sex with Carter. She said that her pregnancy was confirmed in March 1990
and that she informed Luna of this the following month because she believed him the father.
Appellees assert that because Miller had sexual relations with Carter approximately 8 months before
the child's birth, a reasonable person should have known or concluded that Carter could not be the
natural father.

Miller's deposition also states that although she suspected pregnancy prior to relations
with Carter, she thought her symptoms "could be due to nerves." Miller stated that she first saw the
test results excluding Luna as the child's father in court on or about June 4, 1991. When asked if
she felt the results were wrong, she replied "I didn't know" and "I thought it probably was." She
further told the referee that she believed the results were in error. When asked, "after you knew the
blood test had excluded [Luna], then you knew [Carter] was the father, didn't you?", she replied
"[y]es . . . I thought [Carter] would be." She further declared:

> A.      When the blood test came back and said [Luna] was not, I
> thought, well, it has to be Randall Carter.
>
> Q.      . . . was there a logical certainty to that or was there any doubt
> left in your mind?

A.     I was real unsure about it to begin with. I talked to my mother about it at length. She brought up several medical cases, pregnancy upon pregnancy, that made me think that it was probably Randall Carter's.

. . . .

A.     . . . . Obviously, if it wasn't [Luna], it was Randall Carter. . . .

Q.     . . . . How many days after the court hearing was it that you became sure that it was Randall Carter?

A.     I called Randall Carter that day.

. . . .

Q.     . . . . Was there any doubt left in your mind that Greg Luna . . . might have been the father?

A.     I don't know.

Q.     You don't know if he might have been the father or you don't know if there is any doubt in your mind?

A.     I thought that Randall Carter was the father.

Miller said that she did not consider "informal retesting" after getting the results on June 4 because she "was told the test was ninety-nine percent accurate" and she "expected the test to be done correctly." Miller stated that as soon as she received the second test results (involving Carter) she knew that a mistake had been made, but that "[y]ou have to have the second test to be able to compare." As heretofore noted, the second set of blood tests were concluded on September 9, 1992 and Miller's petition as to Carter was dismissed on September 15, 1992. Based upon our review of the record, we find that Appellees have failed to carry the burden of persuading this Court that the one-year statute of limitations has run in this case as a matter of law.

Appellees also argue that Miller and the child have suffered no actionable damages. The complaint alleges as damages "mental anguish, loss of support, loss of social security benefits, and loss of enjoyment of life." According to her deposition, Miller incurred approximately $8,000 in medical expenses related to the birth of her child, for which she was never reimbursed. We reject Appellees' contention that the record establishes that Luna would have been unwilling or unable to pay, thereby rendering these damages too speculative. Based upon the record, we cannot find as a matter of law that these type damages are too speculative to permit recovery.

We further cannot find the alleged damages sustained by Ashley Luna, in the form of child support, too speculative to permit recovery as a matter of law. The record reveals that Luna was employed by CSX Services from August 12, 1991 to January 3, 1992, when he was laid off due to lack of work. He earned $9 an hour as a full time employee. Had the first paternity test revealed Luna as Ashley's natural father, he would have been obligated to and ordered to provide support for his child in accordance with the child support guidelines. It appears that he would have been capable of doing so at least during the period of his employ.

Miller states that although her daughter currently receives social security benefits as a result of her father's death, in the amount of $573 per month, Ashley has not received benefits for the six month period immediately preceding his death. She asserts that the Social Security Administration will only pay up to six months back pay from the time of filing the petition for benefits. She first applied for benefits on behalf of her daughter in April 1993. Appellees contend that the proximate cause of Ashley's being deprived of approximately six months of benefits is her mother's failure to timely establish paternity, which according to Appellees, she could have done had she obtained retesting. This is an argument properly addressed to the trier of fact.

As to the alleged damages of "mental anguish," it appears that Appellants are asserting a claim for negligent infliction of emotional distress. In *Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996), our supreme court abandoned the "physical manifestation" or "injury" rule, holding that such would "no longer be used to test the validity of a prima facie case of negligent infliction of emotional distress." *Camper*, 915 S.W.2d at 446. The court continued:

> [W]e conclude that these cases should be analyzed under the general negligence approach . . . . In other words, the plaintiff must present material evidence as to each of the five elements of general negligence -- duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause, . . . in order to avoid summary judgment. Furthermore, we agree that in order to guard against trivial or fraudulent actions, the law ought to provide a recovery only for "serious" or "severe" emotional injury. A "serious" or "severe" emotional injury occurs "where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." Finally, we conclude that the claimed injury or impairment must be supported by expert medical or scientific proof.

*Camper*, 915 S.W.2d at 446 (citations omitted).

In this case, Appellants have not presented, by affidavit or otherwise, expert medical or scientific proof regarding their alleged emotional injuries. Moreover, we find the record before us inadequate to establish the seriousness or severity of injury which we believe is required under *Camper*. We, therefore, hold the appellees were properly granted summary judgment as to the claim for "mental anguish."

Finally, it is asserted that Appellants are not entitled to recover hedonic damages. Appellants have alleged a "loss of enjoyment of life,"[6] which we treat as a request for hedonic damages. With respect thereto, we find that summary judgment was properly entered in favor of the appellees. In *Spencer v. A-1 Crane Service, Inc.*, 880 S.W.2d 938 (Tenn. 1994), our supreme court specifically held these damages unrecoverable in actions pursued under the wrongful death statutes. *Spencer*, 880 S.W.2d at 943. The *Spencer* court acknowledged two "general rationales" in disallowing damages of this type: first, they do not fulfill the compensatory function of tort law; and second, valuing the pleasures of life is too speculative to form a basis for computing damages. *Id*. We believe these same rationales apply to the present action and warrant a denial of recovery of these damages.

It results that the judgment of the trial court is reversed in part and affirmed in part, with this cause remanded to the trial court for further proceedings herewith consistent. Costs are assessed equally against the parties.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____

[6]Appellants argue that these damages relate to Ashley Luna's loss of the parent-child relationship.

_____

LILLARD, J. (Concurs)