# IN THE SUPREME COURT OF THE STATE OF MONTANA

IN RE THE SELECTION OF A FIFTH MEMBER ) 
TO THE MONTANA DISTRICTING )     O R D E R
AND APPORTIONMENT COMMISSION )

On April 21, 1999, Joe Lamson, Sheila Rice, Elaine Sliter, and Jack Rehberg, members of the Montana Districting and Apportionment Commission informed the Court by letter that they had been unable to select the fifth member and presiding officer of the Commission within the time allowed under Article V, Section 14(2) of the Montana Constitution and Section 5-1-102(1), MCA.

Under Article V, Section 14(2) of the Montana Constitution and § 5-1-102(1), MCA, if the first four designated members of the Commission fail to select the fifth member within the time prescribed, a majority of the Montana Supreme Court shall select the fifth member.

The Court having now considered various recommendations,

IT IS ORDERED that Dr. Janine Pease-Pretty On Top is selected as the fifth member and presiding officer of the Montana Districting and Apportionment Commission.

DATED this 3RD day of August, 1999.

_____
Chief Justice

_____
_____
_____
_____
_____
_____
Justices

STATE LAW LIBRARY

APR 26 2002

OF MONTANA

FILED

AUG 03 1999

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Justice James C. Nelson specially concurs and dissents.

## Introduction

I concur with this Court's appointment of Dr. Janine Pease-Pretty On Top to be the fifth member and chairperson of the reapportionment commission. I strongly dissent, however, from the manner in which we have exercised our power of appointment under Article V, Section 14(2) of the Montana Constitution. This entire process of appointment, including all of this Court's deliberations on this matter, should have been open to the public.

In this regard, and as pointed out by the specially concurring Justices, my dissent does not arise from a ruling by this Court in response to an original proceeding or suit to open to the public our deliberations on this matter. Rather, the genesis of my disagreement is the 5-2 rejection of my motion, made before we began our discussions on this appointment, that we conduct our deliberations and make our decision on this particular matter in open sessions. As noted, the more conventional route for raising this issue would have been an adversary proceeding filed in or against this Court. Notwithstanding, in the twenty-seven years since the adoption of the 1972 Constitution, no one has seen fit to file such a challenge. Why, I do not know, but I suspect that the reason for this failure goes more to the politics of not wanting to go head-to-head with the highest court in this State on a controversial issue directly affecting the fundamental way we conduct our business, rather than it does with the merits of the constitutional arguments for and against.

More to the point, however, how this issue was raised is of little consequence. The

fact of the matter is that no one and no organization should have to sue us or even request that we conform our own operations to the clear and unambiguous mandate of the Constitution. As we stated in *Associated Press v. Bd. of Public Educ.* (1991), 246 Mont. 386, 391, 804 P.2d 376, 379, "[f]irst and foremost, is the realization that the Constitution is the supreme law of this State. *Its mandate must be followed by each of the three branches of government.*" [Emphasis added]. Therefore, it is with this mandate that I begin.

## Discussion

Article II, Section 9 of the Montana Constitution provides:

> **Right to know.** No person shall be deprived of the right to examine documents *or to observe the deliberations of all public bodies* or agencies of state government and its subdivisions, *except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.* [Emphasis added.]

My research reveals no Montana case law ruling on the applicability or inapplicability of this constitutional provision to the judicial branch or, more specifically, to the proceedings and deliberations of this Court. Therefore, I turn to the rules of constitutional construction.

In resolving disputes of constitutional construction, this Court applies the rules of statutory construction. Under those rules, the intent of the framers of the Constitution is controlling and that intent must first be determined from the plain language of the words used. *Butte-Silver Bow Local Govern. v. State* (1989), 235 Mont. 398, 403, 768 P.2d 327, 330 (citation omitted). Moreover, under these rules, if the language is clear and unambiguous, no further interpretation is required. *Lovell v. State Comp. Mut. Ins. Fund*

3

(1993), 260 Mont. 279, 285, 860 P.2d 95, 99 (citation omitted). The courts may not go further and apply any other means of interpretation, *Tongue River Elec. Coop. v. Mont. Power Co.* (1981), 195 Mont. 511, 515, 636 P.2d 862, 864 (citation omitted), nor may a judge insert into a constitutional provision what has been omitted or omit what has been inserted, *see* § 1-2-101, MCA.

Applying these well-settled rules of constitutional construction, it is clear that the plain language of Article II, Section 9, does not exempt this Court from the provision's mandate. Rather, Montana's constitutional "right to know" unambiguously covers the deliberations of *all public bodies of state government.*

Nonetheless, even ignoring the clarity of Article II, Section 9, and the dictates of our constitutional construction jurisprudence, the proceedings of the 1972 Constitutional Convention also lead to the conclusion that the "right to know" requirements do not apply exclusively to the legislative and executive branches of state government and its subdivisions to the exclusion of the judicial branch.

In point of fact, the delegates to the Constitutional Convention amended the language of what became Article II, Section 8 of the Montana Constitution, which gives the public the right to participate in the operations of governmental agencies, on Delegate Berg's motion, so as to exclude the judicial branch. *See* Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1663-67 (comments of Delegates Berg, Dahood, and McNeil). Notwithstanding that these same delegates discussed the language of what became Article

4

II, Section 9 of the Montana Constitution on the same afternoon that they amended the language of what became Article II, Section 8, they did not even discuss amending the language of what became Article II, Section 9, so as to exclude the judicial branch. *See* Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1667-1680.

Delegate Berg, however, subsequently moved to amend the language of what became Article II, Section 9, out of his concern that the phrase "public bodies" could be interpreted to include juries, grand juries, or the deliberations of this Court. Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, pp. 2499-2501. Delegate Dahood stated that he agreed with Delegate Berg and that the committee was "not trying to upset any traditional rule of procedure with respect to anything within the judiciary." Notwithstanding, Delegate Dahood stated that he would not amend the section as Delegate Berg had suggested. Delegate Berg then stated in his closing statement in support of his motion that "my purpose in asking to delete the word[s] 'bodies or' is to eliminate the potential interpretation that it might include juries, grand juries, [or] Supreme Court deliberations." Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, p. 2501. Despite Delegate Berg's concerns, his motion failed. Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, p. 2501.

Thus, even though Delegate Berg expressed the same concern with regard to what became Article II, Section 8, and what became Article II, Section 9, the delegates amended only the language of what became Article II, Section 8, so as to exclude the judicial branch.

5

More to the point, the delegates declined to amend the language of what became Article II, Section 9, so as to exclude the judicial branch even though faced with the same concern that prompted them to amend what became Article II, Section 8.

Hence, not only the plain language but also the constitutional history of these companion provisions of the Montana Constitution show that Article II, Section 9, is broader than Article II, Section 8. Article II, Section 9, gives the public the right to *observe* the deliberations of *all public bodies* and agencies while Article II, Section 8, gives the public the right to *participate* only in the operations of *agencies*. That, of course, begs the question whether this Court is a "public body." The answer to this question is undeniably "yes."

In *Common Cause v. Statutory Committee* (1994), 263 Mont. 324, 329, 868 P.2d 604, 607, we noted that the rights which Article II, Section 9, guarantees are protected and implemented primarily through Montana's open meeting statutes, codified at §§ 2-3-201, *et seq.*, MCA. One of these statutes, § 2-3-203(1), MCA, provides:

> All meetings of *public or governmental bodies*, boards, bureaus, commissions, agencies of the state, or any political subdivision of the state or organizations or agencies supported in whole or in part by public funds or expending public funds must be open to the public. [Emphasis added.]

In *Common Cause*, we recognized that the legislature did not define "public body" or "governmental body" in the open meeting statutes. *Common Cause*, 263 Mont. at 330, 868 P.2d at 608. Thus, we gave the words in these phrases their "plain, ordinary and usual meaning" and stated that "the common understanding of the phrase 'public or governmental body' would include a group of individuals organized for a governmental or public purpose."

6

*Common Cause*, 263 Mont. at 330, 868 P.2d at 608 (citations omitted). There can be no doubt, this Court is a group of individuals organized by and under the Montana Constitution for a governmental purpose. It follows, then, that this Court is a public or governmental body.

Similarly, in *Great Falls Tribune Co., Inc. v. Day*, 1998 MT 133, ¶ 16, 289 Mont. 155, ¶ 16, 959 P.2d 508, ¶ 16, this Court, in determining whether the Department of Corrections Committee for Private Prison Screening and Evaluation was a "public body," looked to the Montana Procurement Act, which defines "governmental body" as

> a department, commission, council, board, bureau, committee, institution, legislative body, agency, government corporation, or other entity, instrumentality, or official of the executive, legislative, or *judicial branch* of this state, including the board of regents and the Montana university system.

Section 18-4-123(11), MCA (emphasis added). We stated that, since the committee was a committee of the executive branch of government, and a "governmental body" for purposes of procurement, "it necessarily follows that it is an agency of state government to which Article II, Section 9, applies." *Great Falls Tribune*, ¶ 17. This Court is clearly an "entity . . . of the . . . judicial branch of this state," and, therefore, a "governmental body." Section 18-4-123(11), MCA. Thus, it "necessarily follows" that this Court is a "public body" to which Article II, Section 9, applies. *Great Falls Tribune*, ¶ 17.

The same conclusion can be drawn from our decision in *Becky v. Butte-Silver Bow Sch. Dist. 1* (1995), 274 Mont. 131, 906 P.2d 193. In *Becky*, this Court, in determining whether the records of an organization were "documents of public bodies," looked to § 2-6-

7

101(2)(a), MCA, which states that "public writings" are

> the written acts or records of the acts of the sovereign authority, of official bodies and tribunals, and of public officers, legislative, *judicial*, and executive, whether of this state, of the United States, of a sister state, or of a foreign country;

*Becky*, 274 Mont. at 137, 906 P.2d at 197 (quoting § 2-6-101(2)(a), MCA) (emphasis added). Section 2-6-101, MCA, also states that there are four classes of public writings and that "judicial records" are one of the classes. Section 2-6-101(3)(b), MCA. Finally, although we recognized that "documents of public bodies" is not defined in the Montana Constitution, we stated that "it must reasonably be held to mean documents generated or maintained by a public body which are somehow related to the function and duties of that body." *Becky*, 274 Mont. at 138, 906 P.2d at 197.

Applying the definition of "public writings" found in § 2-6-101(2)(a), MCA, it is clear that most, if not all, of the documents which this Court generates and maintains are "public writings," and, therefore, are "documents of a public body." Thus, since the documents which this Court generates and maintains are "documents of a public body," it follows (perhaps backwardly) that this Court is a "public body" to which Article II, Section 9, applies.

As these cases demonstrate, this Court has been particularly vigilant and uncompromising in protecting Montanans' constitutional "right to know" and in rejecting other governmental bodies' attempts to limit or subvert this right. In *Great Falls Tribune*, for example, the committee argued that the public's right to observe its meetings with private

8

companies which had submitted proposals to build a private correctional facility in Montana and to review the papers associated with the companies' proposals was outweighed by the companies' right to privacy in the information that they had submitted. *Great Falls Tribune*, ¶ 8. We held, however, that the Great Falls *Tribune* had a constitutional right under Article II, Section 9, to observe the committee's deliberations and to examine the committee's documents, including proposals that had been submitted to it. *Great Falls Tribune*, ¶ 33. We also stated that the only exception to the public's right to observe the committee's deliberations and documents concerned information to which the companies had a privacy interest. *Great Falls Tribune*, ¶ 33.

In sum, and based on the foregoing, if there exists some valid argument for exempting the deliberations and decision-making processes of this Court from the operation of Article II, Section 9, the rationale is neither apparent in the tenor of our prior jurisprudence nor, more importantly, in the plain language of the constitutional provision itself or in the history of its adoption.

And, with regard to the latter, while the concurring Justices read the Constitutional Convention history of Article II, Section 9, a great deal more restrictively than I do, nevertheless that history--and our disagreement over what it means--is largely academic. For, as we made eminently clear in *Associated Press*,

> [t]he language of [Article II, Section 9] speaks for itself. It applies to all persons and all public bodies of the state and its subdivisions without exception. Under such circumstances, it is our duty to interpret the intent of the framers from the language of the provision alone and not to resort to

9

extrinsic aids or rules of construction in determining the intent of the delegates to the Constitutional Convention.

*Associated Press*, 246 Mont. at 392, 804 P.2d at 379 (quoting *Great Falls Tribune v. District Court* (1980), 186 Mont. 433, 437-38, 608 P.2d 116, 119.

Similarly irrelevant are the concurring Justices' concerns as to the impact of complying with Article II, Section 9, on the operations and functioning of this Court. In this regard, I make three observations. First, since we are bound by the "right to know" provision of the Constitution of Montana, we, and litigants, will simply have to deal with the consequences and changes that flow from opening our deliberations and operate accordingly. Other public bodies of state government seem to be able to comply with the requirements of Article II, Section 9, and, yet, function quite well. I find it difficult to believe that, given the caliber of the justices serving on this Court, that we are not, likewise, up to the task. Likewise, I refuse to be cowed by the concurrences' parade of horribles--internal memos and proposed opinions being made public, media blitzes, masses of the unwashed converging upon the Court, cases settling, criminals jumping bail. Good grief! If, before a final opinion is handed down, litigants want to settle, jump bail or jump off a bridge, for that matter, they can, and often do that now. If votes change between the time of initial discussion and final opinion, then those who acted prematurely will have to bear the consequences of their bad or good decision.

Second, in my experience, every public body that has been faced with the prospect of opening its operations to the press and public has put forth a whole list of problems and

reasons why it is unique; why "right to know" should not apply to it; why the functions and, perhaps, very existence of the body itself will be compromised by the changes that will be forced upon it; and why the public will run amuck or abuse the new found information gleaned from open meetings. In point of fact, in the many cases where we have rejected these very arguments and have, instead, required compliance with the Constitution, the sky did not fall; the sun rose the next day; the public body complied; and the business of government went on. Again, and despite the concurring Justices' concerns, I suggest that this Court would continue to function quite effectively and quite well if we opened our deliberations and proceedings in compliance with Article II, Section 9.

Third, the concurring Justices raise the specter of opening to the press and public the deliberations of trial juries. In doing so, they read more into my dissent than I have written. My present concern is with the applicability of Article II, Section 9, to the operations of this Court. I agree that there are fundamental differences in the functioning of trial juries that may well, if not likely, preclude the provision's applications to those bodies. That, however, has absolutely nothing to do with the matter at issue. I believe that the requirements of Article II, Section 9, apply to the operations of this Court, and that is all this dissent is about.

Finally, even assuming *arguendo*, that somehow the "right to know" provisions of the Montana Constitution do not apply to the *judicial* deliberations and decision-making processes of this Court, the exercise of our power of appointment under Article V, Section 14(2), is not a judicial function but is, rather, an *administrative* one. We are not here called

11

upon to decide a justiciable controversy, to rule on a legal question, to interpret the law or the Constitution, to issue a writ, to discipline an attorney, to make rules governing the practice and procedure before the courts of this State, or to appoint persons to committees and commissions that directly affect the operation of the courts and the administration of justice--all traditional judicial functions.

To the contrary, we are here simply executing a default power to appoint the fifth person to a bi-partisan commission whose decisions will impact primarily the legislative branch and the future balance of political power between the Democrat and Republican parties, between urban and agriculture interests, and between Indians and non-Indians in this State. Requiring judges to make an appointment to a non-judicial, political commission-- even where that requirement is based in the Constitution--does not make the appointment or the process and deliberations leading up to it a judicial function any more than is a judge's performance of the administrative act of hiring, supervising, demoting or firing a judicial employee a judicial function. Simply put--and the law is clear on this point--not every official act required of a court is a judicial function because the act in question happens to be performed by a judge. *See Forrester v. White* (1988), 484 U.S. 219, 227, 108 S.Ct. 538, 544, 98 L.Ed.2d 555; *Clark v. Dussault* (1994), 265 Mont. 479, 487-88, 878 P.2d 239, 244; *Clark*, 265 Mont. at 490-93, 878 P.2d at 246-48 (Nelson, J., concurring).

Indeed, in this context and recognizing the exercise of our appointment authority under Article V, Section 14(2), for what it is--an administrative decision impacting primarily

12

the legislative branch--I find it ironic, to say the least, that decisions of this Court and the district courts have preserved Montanans' "right to know" and to observe the making of similar sorts of decisions in the pre-session and in-session political party caucuses against legislative attempts to keep those proceedings and deliberations closed to the press and public. *See Assoc. Press v. Senate Republican Caucus* (1997), 286 Mont. 172, 951 P.2d 65. Yet, this Court is unwilling to subject its own processes and deliberations involving essentially the same sort of decision to the constitutionally-mandated public scrutiny that we have held applies to the legislature. I cannot accept this double standard.

Justice Leaphart, however, believes the double standard is justified--in fact, mandated--because our appointment authority is grounded in the Constitution itself. I cannot agree. There is no basis for concluding that the discharge of our obligations under Article V, Section 14(2)--whether those are characterized as judicial or administrative--and under Article II, Section 9, are incompatible or are mutually exclusive. Indeed, the fallacy of this argument is that it assumes that this Court will be unable to act "judicially"; that we will be unable to perform "uniquely judicial" functions; that somehow we will be less "independent" or not as "apolitical"; and that we will fail the test of "impartiality" if we open our proceedings and deliberations to the public, as the Constitution, Article II, Section 9, clearly requires. Nonsense.

I cannot for a moment believe that the members of this Court will suddenly transform into a bunch of political hacks, unable to render impartial, independent decisions--judicial

13

or administrative--subject to the pressures of lobbying and paralyzed by an inability to entertain thoughtful discussions, if we open our decision-making processes to public scrutiny. In fact, if anything, the opposite is the more likely consequence. Like Justice Trieweiler, I can think of no better guarantee of impartiality, of prepared, thoughtful discussion and comment and of judicious decision-making than knowing that the collective processes and individual comments and opinions of this Court's members will be subject to observation and probing analysis and reporting by the media and careful examination by interested members of the public. I can think of no better guarantee against litigants and attorneys lobbying the members of this Court (assuming *arguendo* that anyone would be unethical and, frankly, stupid enough to do that) than their knowing that such efforts would most likely headline the morning paper.

Why, after all, did the framers include Article II, Section 9, in the Constitution? The answer is self-evident. Elected officials, government bureaucrats and public officers are less likely to cut deals and corners if they have to operate in a fish bowl. Very simply, when public employees and officials--judges included--perform the public's business, the public is entitled to observe and to understand how they are going about it. More to the point, if, as Justice Leaphart argues, the judiciary is, by its very nature and as a distinct branch of government, already pure of purpose, intention and action, what conceivable harm would follow in simply letting the press and public observe that first-hand? If we've nothing to hide, then what need have we of secrecy? Is this Court incapable of complying with the right

14

to know provision of the Montana Constitution, yet balancing at the times needed, that right with the right of individual privacy? We should all resign if we are that inept. Contrary to the concurring Justice's comments, open deliberations will not make this a less effective Court; it will make us all better justices.

Likewise, I am similarly unpersuaded by Justice Leaphart's reliance on the fact that other courts have determined that "judicial deliberations are confidential." Our obligation to open our deliberations is, as I have discussed at length above, required by Article II, Section 9, of the Montana Constitution. Justice Leaphart appears to concede that this provision is broader than similar provisions in other states. That should end the discussion. This Court is bound by this State's Constitution not some other state's or by common law tradition. Moreover, how many times has this Court announced its determination to find its own unique path in the requirements of Montana's own unique Constitution, proudly--nay, defiantly--"refusing to march lockstep" with other jurisdictions, state and federal? There is no good reason, much less a legal one, why we must suddenly fall in behind the parade on this issue either.

Finally, as to Justice Leaphart's discussion of the reach of other provisions of Montana's Constitution, I can only note that we have not determined the scope of those. I am not willing to offer any opinion at this time as to how those provisions might or might not be read. We have, however, and as pointed out above, unequivocally held that the language of Article II, Section 9, speaks for itself without reference to extrinsic aids, rules of

15

construction or resort to the history of the Constitutional Convention; that these provisions apply to all persons and all public bodies of the state without exception; and that the mandates of Article II, Section 9 must be followed by each of the three branches of government. *Associated Press*, 246 Mont. at 391-92, 804 P.2d at 379. Either we meant what we said, or, at the earliest opportunity, we should overrule these statements as meaningless, sanctimonious, claptrap.

In closing, I am satisfied that the person this Court has appointed is well-qualified to chair the reapportionment commission. Her vote will likely be crucial on many important decisions to be made by the commission in the coming months. But, the names of other well-qualified persons[1] were also placed before this Court for consideration and were, in fact, fairly considered. Had the process been open, the public would have been informed and would have benefited from our discussions and deliberations. Had we simply complied with Article II, Section 9, the integrity of the entire appointment process would have been enhanced and verified. And, unfortunately, since we did not open our deliberations and discussions to the public, those who will now speculate and criticize our choice will find ample fodder in the ignorance which is always bred of secrecy.

We, as a Court, had a unique chance--certainly one unprecedented in Montana and,

---

[1] Those include: E. Edwin Eck, Dean of the School of Law, University of Montana; J. Martin Burke, Professor, School of Law, University of Montana; Don Sollars, former Chief Judge, Blackfeet Tribal Court; H.J. Pinsoneault, Attorney; Tom Cherry, Management Consultant.

perhaps, even in this country--to practice the principles of open government that we so often preach. Sadly, we squandered this opportunity. In that I dissent.

_____
Justice

Justice Terry N. Trieweiler concurs in the foregoing special concurrence and dissent.

_____
Justice

17

Justice Terry N. Trieweiler specially concurs and dissents.

I likewise concur with this Court's appointment of Dr. Janine Pease-Pretty On Top to be the fifth member and chair of the reapportionment commission.

I also concur, however, with Justice Nelson's dissent from the manner in which this Court has made its decision.

Justice Nelson has accurately and capably analyzed the constitutional requirement that this Court's deliberations be subject to public observation. I would simply like to add my personal observation regarding what I believe would be practical benefits from greater public scrutiny of this Court's performance.

I have now served on this Court for eight and one-half years. During that service, there have been times when I felt the Court did not function well as an institution. During those times, greater public scrutiny would have led to constructive criticism and ultimate improvement in the process by which this Court arrived at its decisions.

At other times, it has been my opinion that this Court has performed with unique distinction. Public scrutiny at those times, would have enhanced public confidence in the Court as an institution and the process by which many significant issues in this State have been decided.

I do not agree with those who suggest that the members of this Court could not function as candidly and effectively as they do now if the Court's deliberations were open to the public. While certainly over the course of eight and one-half years remarks have been

18

made during conference which wouldn't have been made with reporters present, no one can seriously contend that those remarks contributed anything of a positive nature to the decision making process.

Furthermore, it has always mystified me how this Court can continue to operate privately in the face of an obvious constitutional mandate to the contrary on the basis that it is simply a more effective way to proceed, when at the same time the judiciary prohibits school boards from discussing collective bargaining strategy privately (*see Great Falls Tribune v. Great Falls Pub. Sch.* (1992), 255 Mont. 125, 841 P.2d 502); tells local government that it cannot discuss litigation strategy privately (*see The Associated Press v. the Board of Pub. Educ.* (1991), 246 Mont. 386, 804 P.2d 376; and prohibits the legislative caucuses from discussing partisan strategy privately (*see The Associated Press v. Montana Senate Republican Caucus*, No. CDV 95-218 (Lewis and Clark County Dist. Ct. filed June 4, 1998). Certainly, these public bodies felt strongly that these functions could be performed more "effectively" without public scrutiny.

I concur with Justice Nelson's constitutional analysis of our obligation to conduct our business publicly, and simply add that openness is not only constitutionally required, I believe it would lead to a consistently better product and a judicial institution in which the public has greater confidence.

_____
                    Justice

19

Justice Jim Regnier specially concurs.

I enthusiastically concur in the Court's appointment of Dr. Pretty On Top to this important position. I also join my colleagues, Justices Nelson and Trieweiler, in their strong belief in open government. It is not only the right view, it is mandated by our Constitution. As Justice Nelson correctly notes regarding Montana's constitutional Right to Know, this Court has been "vigilant and uncompromising in rejecting other governmental bodies' attempts to limit or subvert this right." For the reasons stated below, however, I do not share the dissenting view that Article II, Section 9 of Montana's Constitution applies to the deliberations of the Montana Supreme Court.

At the outset, I think that it is important to appreciate the context in which this matter is before us. This Court is exercising its power of appointment pursuant to Article V, Section 14(2) of Montana's Constitution and Title 5, Chapter 1 of the Montana Code Annotated. These provisions provide that the Montana Supreme Court shall appoint the fifth member of the Montana Districting and Apportionment Commission in the event the Commission is unable to reach agreement on a fifth member. The issue addressed by the dissent, that is whether the deliberations of the Montana Supreme Court regarding this appointment are subject to Article II, Section 9, is not before us as a contested issue. In the usual case, parties to a dispute file briefs with this Court setting forth legal arguments to support their respective positions. When we were informed that the Commission was unable to select a fifth member, we proceeded to place this matter on our weekly agenda in the same manner as any

20

other matter is addressed by this Court. No person or entity has filed an original action in this Court contesting the manner in which we determined to proceed.

I recognize that some may interpret my view that the deliberations of this Court are exempt from the provisions of Article II, Section 9, as disingenuous. Indeed, many may criticize such a position when this Court has forced other public bodies to open up their deliberations to public view and the necessary scrutiny that follows. However, after reviewing the applicable transcript of the Constitutional Convention, it seems clear to me that the Delegates never intended the provisions of Article II, Section 9 to apply to the deliberations of this Court. Furthermore, in my view, opening the conferences of this Court to the public would detract from, rather than improve, our ability to serve the citizens of this state.

Any scrutiny of a constitutional provision must begin with an examination of the text in question. The dissent suggests that a plain reading of Article II, Section 9 leads one to the inescapable conclusion that the provision applies to the deliberation of judicial bodies, in particular, the deliberations of this Court. Therefore, under our accepted rules of construction, the dissent argues we should go no further in our analysis. From my reading of the provision, however, it is not clear that the phrase "deliberations of all public bodies" found in Article II, Section 9, includes the deliberations of the Montana Supreme Court. Since the adoption of our current Constitution, I am unaware of any actions filed in this Court or any district court in this state contending Montana's constitutional Right to Know

21

includes the right to observe the deliberations of this Court. The absence of such a challenge suggests to me that it is not clear and unambiguous that this provision applies to such deliberations. As the dissent points out, Article II, Section 9 has been the subject of considerable litigation as it applies to various governmental bodies. No litigation, however, has ever alleged that the proceedings of this Court were in violation of the provision. Although we have defined "public body" in a variety of ways as contested cases were presented to us, none of these cases involved the precise issue addressed here, that is whether this Court is considered a "public body" for the purposes of Article II, Section 9.

A review of the transcript of the Montana Constitutional Convention of 1972 is helpful in analyzing this important question. Justice Nelson correctly points out that the Delegates to the Constitutional Convention specifically amended the language of what became Article II, Section 8 of the Montana Constitution which gives the public the right to participate in the operations of governmental agencies.

Article II, Section 8 of Montana's Constitution provides:

**Right of participation.** The public has the right to expect governmental agencies to afford such reasonable opportunity for citizen participation in the operation of the agencies prior to final decision as may be provided by law.

The relevant transcript relating to Section 8 discloses that Delegate Berg was concerned that an earlier draft which used the word "government" rather than "governmental agencies" might reasonably be interpreted to include the judiciary which unquestionably is a branch of the government. Delegate Berg pointed out that this provision could be interpreted to mean

22

that the public would not only have the right to observe trials and other judicial proceedings, but would also have the right, in some fashion, to participate in the judicial process such as preparing jury instructions or providing input to the court in the preparation of the court's orders. Delegate McNeil had a similar concern that the provision might be interpreted as providing the public the right to actually participate by way of vote in the legislature or the Montana Supreme Court. Addressing these concerns, the text was ultimately amended by substituting the term "governmental agencies" for "government." *See* Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1663-67.

The dissent posits that Delegate Berg's proposed amendment to Section 8, and its acceptance by the Delegates, sheds light on the ultimate breadth and meaning of Section 9. Delegate Berg also moved to amend the language of what became Article II, Section 9 out of concern that the phrase "public bodies" might be interpreted to include juries, grand juries, or the deliberations of this Court. Delegate Dahood, Chairman of the Bill of Rights Committee, responded:

> And I think the interpretation that he has given could possibly be laid against this section, but I am very reluctant to rise in opposition to Delegate Berg on this issue because I'm certainly in accord with everything that he says, except *I'm not satisfied in my mind and judgment that a court could conceivably give that interpretation to "bodies". We are referring there to public bodies; perhaps city councils, perhaps some bureaucratic groups or some bureau that may have been established perhaps for some particular special public purpose . . . . I think our comments clearly indicate that we are not trying to upset any traditional rule of procedure with respect to anything within the judiciary.*

(Emphasis added.) *See* Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, at 2499-500.

From the actions of the Delegates relating to Delegate Berg's proposed amendments to Sections 8 and 9 of Article II, the dissent reasons that since the Delegates accepted Delegate Berg's argument and amended Article II, Section 8, but refused to amend Article II, Section 9 when Delegate Berg made a similar suggestion, the conclusion is that the Delegates intended that Article II, Section 9 be broader in scope than Section 8.

My review of the transcript indicates that there were logical reasons to support the Delegates' action of voting in favor of Delegate Berg's proposed amendment to Section 8, while rejecting his proposed amendment to Section 9. There is no question that a preliminary draft of Section 8 which used the term "government" might very legitimately have been interpreted to include the judiciary, which unquestionably is a branch of the government. Thus, it is clear to me that the Delegates felt that Delegate Berg's concerns about Section 8 were justified.

Notwithstanding their vote on the Section 8 amendment, my reading of the transcript discloses that the Delegates did not intend that Article II, Section 9 should apply to deliberations of this Court, juries or grand juries. In fact, very little discussion took place after Delegate Dahood, a lawyer, seemed to convince the Delegates that no "court could conceivably give that interpretation to 'bodies' . . . . [and that] our comments clearly indicate that we are not trying to upset any traditional rule of procedure with respect to anything with

24

the judiciary." My interpretation of this dialogue at the Convention is that the Delegates were apparently persuaded that Delegate Berg's proposed amendment to Section 9 was unnecessary. I see nothing in the transcript to suggest that the framers ever intended that Article II, Section 9 be interpreted as the dissent suggests.

The reasoning of Delegate Dahood was sound at the Convention and is sound today. If we were to conclude that Article II, Section 9 applies to the deliberations of the Montana Supreme Court, the judicial process of this institution, as we know it, would be significantly different and, in my view, compromised. It is not uncommon for this Court to deliberate on a particular case for months, even after the briefing is completed and oral argument has been conducted. During this time additional research is pursued, the transcript of the proceedings below is reviewed by the Justices, and proposed opinions and dissents are circulated and discussed during Court conferences. Preliminary votes quite often change as the case progresses to a final written opinion. If the public, which of course includes the parties to the litigation, were able to observe these deliberations, there is no question in my mind that the parties would act in anticipation of the Court's decision. The opinion ultimately handed down by this Court, in many instances, may be entirely different than the parties' prediction. I don't believe such a process would benefit anyone.

My other major concern is that the judicial process itself would be detrimentally impacted by the public attention that would no doubt be directed to the Court as it deliberates over cases. Efforts to lobby the Court both directly and indirectly would inevitably occur

25

especially in high profile or controversial matters. Unlike the legislative process, where continuous interaction with the citizenry is desirable, judicial decision making functions best in an environment where such influences are avoided. Sound judicial decisions are made by reflecting on principles of law, hopefully unswayed by public opinion. In fact, many judicial decisions are unpopular, as members of this Court are acutely aware. However, the unpopular decision is more often than not the legally correct one. I believe our ability to function in such a fashion would be significantly jeopardized by open conferences.

Finally, under the analysis of the dissent, one might logically suggest that the entire jury deliberation process would necessarily also be open to the public. It is hard for me to imagine how such a jury system could function. Ordinary citizens who are called to jury duty are the true heroes in our system of justice. Jurors make difficult decisions that affect the very liberty and property of the persons involved in the litigation. The time-honored tradition in this country has always been that no one, not the lawyers, the judge, the media, or anyone, is allowed to observe, participate or invade jury deliberations. Imagine, for instance, the spectacle of a criminal jury sitting in judgment of an accused who is present in the jury room during deliberations.

Justice Nelson points out that even if one concedes that the Right to Know provisions do not apply to judicial deliberations, our function in making this appointment to the Montana Districting and Apportionment Commission was purely administrative in nature and most certainly subject to the provisions of Article II, Section 9. This Court is involved in

26

many functions which are not technically judicial, such as adopting rules governing the procedure of the Court and making appointments to various commissions of the Court, only to name a few. I think it would be an unwieldy process if we were to attempt to segregate out our judicial functions from administrative ones for the purpose of Article II, Section 9. My interpretation of Delegate Dahood's comments that "we are not trying to upset any traditional rule of procedure with respect to anything within the judiciary" applies to our administrative functions as well.

In my view, Article II, Section 9, commonly referred to as Montana's constitutional Right to Know provision, does not and was never intended to apply to deliberations of the Montana Supreme Court.

_____
Justice

Chief Justice J. A. Turnage, Justice W. William Leaphart, and Justice Karla M. Gray join in the foregoing specially concurring opinion of Justice Jim Regnier.

_____
Justice

_____
Justice

_____
Justice

27

Justice W. William Leaphart, specially concurring.

I find myself in the anomalous position of replying to a dissent in a matter in which there is no opinion by the Court and no adverse parties who have filed briefs and framed the issues. Despite this unusual posture, the dissenters have *sua sponte* raised some very profound issues about the deliberative process of judges and juries in light of the constitutional right to know and I take this opportunity to express my disagreement with their interpretation of our constitutional guarantees.

The dissent argues that all deliberations of this Court should be open to the public under the right to know provision of the Montana Constitution.[1] In particular, Justice Nelson contends that our appointment of a fifth commissioner to the reapportionment commission is, like the hiring or firing of a court employee, an administrative matter that should be open to the public. As I will elaborate below, I disagree that our deliberations are subject to the right to know provision. Furthermore, I do not agree that our constitutional obligation to appoint a commissioner is, as the dissent argues, a mere administrative matter like the hiring or firing of a court employee.

Whether this Court's appointment of a fifth member of the reapportionment commission is a judicial action should turn on whether that action is judicial in the sense that it is unique to this Court. Is the action of a distinctive nature that no other governmental

---

[1] For convenience I have denoted Justice Nelson's special concurrence and dissent as "the dissent," because Justice Trieweiler, in his special concurrence and dissent, states that he is in agreement with Justice Nelson's constitutional analysis of the right to know provision.

28

entity can perform?

I submit that the answer to the inquiry is readily apparent: Montana's Constitution expressly provides that when the legislative appointees cannot agree on the appointment of a fifth member to the reapportionment commission, *"a majority of the supreme court shall select him."* Art. V, Sec. 14(2), Mont. Const. (emphasis added). The Constitution mandates that this Court and no other entity perform the appointment task.

Although we could end the inquiry here, I note that the Constitutional Convention history shows that the framers intended that this Court's appointment of fifth commission members embody the institutional characteristics that uniquely distinguish the judiciary. The Montana Constitutional Convention Comments provide:

> The committee considers reapportionment and redistricting to be a troublesome and time consuming matter for a legislative body because of the legislature's difficulty in being objective. . . . The committee recognized that redistricting and reapportionment has political repercussions, so the proposed section provides for bipartisanism in the method of selection of the first four members. The fifth member of the commission becomes the key vote and his selection by the other four members is to insure impartiality.

I Montana Constitutional Convention, Comments, p. 393. Thus, the Constitutional Convention framers' comments make clear that in the event that legislative appointees cannot agree on a fifth member for the commission, our Constitution's framers intended that an apolitical, independent entity make the appointment: Montana's Supreme Court.

It strains credulity to suppose that the framers intended that this Court make such appointments without observing the very judicial traditions that enable it to operate as an

29

apolitical and independent branch of government. As Montana Supreme Court justices who are *constitutionally* required to make this appointment when the partisan legislative appointees cannot agree among themselves, I submit that we act in our judicial capacity and not as mere administrators.

Turning then to the broader question of whether our deliberations of judicial matters are subject to the right to know provision, I am not aware of any appellate court that allows the public to observe its deliberations. I am also not aware of any other state that has a similarly broad constitutional right to know provision.[2] However, other state courts have expressly affirmed the common-law tradition of private judicial deliberations. For example, in In Re Inquiry Concerning a Judge, Gridley (Fla. 1982), 417 So.2d 950, 955, the court observed that "judicial deliberations are confidential." In People v. Mallory (Mich. 1967), 147 N.W.2d 66 (Souris, J. concurring), a judge offered a cogent discussion of that common-

---

[2] Other states' constitutional right to know or observe provisions are expressly limited. Article XI, Section 5 of North Dakota's constitution provides that *"[u]nless otherwise provided by law*, all meetings of public or governmental bodies, boards, bureaus, commissions, or agencies of the state or any political subdivision of the state, or organizations or agencies supported in whole or in part by public funds, or expending public funds, shall be open to the public." Art. XI, Sec. 5, N.D. Const. (emphasis added). Similarly, Article XII, Section 3 of Louisiana's constitution provides that "[n]o person shall be denied the right to observe the deliberations of public bodies and examine public documents, *except in cases established by law*. Art. XII, Sec. 3, La. Const. (emphasis added). Part one, Article 8 of the New Hampshire constitution provides that "[a]ll power residing originally in, and being derived from, the people, all the magistrates and officers of government are their substitutes and agents, and at all times accountable to them. Government, therefore, should be open, accessible, accountable, and responsive. To that end, the public's right of access to governmental proceedings and records *shall not be unreasonably restricted*." Pt. one, Art. 8, N.H. Const. (emphasis added).

law tradition:

> It has been my understanding that views expressed by judges of an appellate court while deliberating upon their decisions are confidential until they appear in an opinion, if they ever do, over the signature of the author. Such privacy permits judges to discuss freely among themselves all issues involved in a case, to advance tentative views for the sometimes enlightening reactions of wiser colleagues and to criticize candidly and sometimes bluntly the notions offered by other colleagues, all without fear of subsequent embarrassment to any member of the Court by public disclosure of anything said or written which does not survive the ordeal as a subscribed formal opinion. In my judgment such freedom of expression *in camera* should be encouraged among Justices whose duty it is to strive, at least, to reach majority accord when that can be achieved without compromise of legal principles.

*Mallory*, 147 N.W.2d at 74.

Federal courts have also affirmed the confidentiality of judicial deliberations, recognizing that candid deliberations are essential to an independent judiciary and suggesting that there is a judicial privilege. In United States v. Nixon (1974), 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, the Court recognized that

> [h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. Whatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Art. II powers, the privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and privileges flow from the nature of enumerated powers.

*Nixon*, 418 U.S. at 705, 94 S.Ct. at 3106, 41 L.Ed.2d at 1062. The *Nixon* Court concluded that "[t]he expectation of a President to the confidentiality of his conversations and correspondence, *like the claim of confidentiality of judicial deliberations*, for example, has all the values to which we accord deference for the privacy of all citizens." *Nixon*, 418 U.S.

31

at 708, 94 S.Ct. at 3107, 41 L.Ed.2d at 1063-64 (emphasis added). The Eleventh Circuit has recognized a judicial privilege in confidential judicial communications. *See* Matter of Certain Complaints Under Investigation (11th Cir. 1986), 783 F.2d 1488, 1520 (concluding "there exists a privilege . . . protecting confidential communications among judges and their staffs in the performance of their judicial duties. . . . In the main, the privilege can extend only to communications among judges and others relating to official judicial business").

In two fundamental respects I disagree with the dissent. First, when Montana's constitutional right to know provision (hereafter, right to know provision) is read with regard to established canons of construction and to the interdependent structure of Montana's Constitution, it is clear that judicial deliberations fall well outside the scope of the public's right to know. Second, to treat Montana's judiciary as a "public body" would do real violence to the Montana Constitution's requirement of an independent judiciary that serves as a distinct branch of government.

It should be apparent that the meaning of "public bodies" is ambiguous: if nothing else, the long arduous procession of decisions cited by the dissent evinces the patent ambiguity of that phrase. Nor are those cases in agreement about the meaning of the right to know provision's recognition of public bodies and agencies of state government. For example, in SJL of Montana Assoc. v. City of Billings (1993), 263 Mont. 142, 867 P.2d 1084, the Court examined the constitutional history of the right to know provision for guidance in determining the elusive statutory meaning of "agency" under Montana's open

32

meeting laws and concluded:

> The following remarks exemplify the thrust of the debate on "governmental agencies": DELEGATE DaHOOD: . . . Once again, I want to point out, we have in mind the governmental agencies that are miniature legislatures who put together rules and regulations that affect us all.
>
> DELEGATE McNEIL: . . . I think . . . [governmental agencies] is what the committee intended to reach with this, and that is appointive commissions, bureaus, so forth.

*SJL*, 263 Mont. at 148, 867 P.2d at 1087-88. The *SJL* Court concluded that "[i]t is obvious from these and other remarks that the framers of the Constitution were concerned with governmental entities which had rule-making authority and regulatory powers." *SJL*, 263 Mont. at 149, 867 P.2d at 1088. However, in a dissenting opinion, Justice Trieweiler argued that "[t]he majority opinion ignores the plain language of Article II, Section 9, Montana Constitution. . . . What was prohibited [by a previous decision of the Court] is exactly what was done in this case." *SJL*, 263 Mont. at 150-51, 867 P.2d at 1089 (Trieweiler, J. dissenting). I raise *SJL* not to argue the merits of that decision but rather to show that the meaning of the phrase, "public bodies or agencies," is hardly plain and unambiguous.

Moreover, it is an established rule of construction that words in a statute or constitution not be treated as mere surplusage; we presume that each word has a particular and intended significance. However, the dissent urges that this Court is simply "a group of individuals organized by and under the Montana Constitution for a governmental purpose" and that the Court is a "public body" under the right to know provision. Thus, under the dissent's construction, a "public body" is the substantive equivalent of a branch of

33

government. The dissent has therefore rendered Article III, Section 1's recognition of distinct branches of government mere surplusage. *See* Art. III, Sec. 1, Mont. Const. (providing that "[t]he power of the government of this state is divided into *three distinct branches*") (emphasis added). I do not agree that the Montana Constitution's separation of powers provision can be so easily dismissed.

Yet another established rule of construction is that when statutory or constitutional language is ambiguous, a court may consider the intent of its drafters. The Montana Constitutional Convention Comments to the right to know provision provide in part that it is a companion to the right of participation and that

> Both arise out of the increasing concern of citizens and commentators alike that government's sheer bigness threatens the effective exercise of citizenship. . . . The provision stipulates that persons have the rights to examine governmental documents and the deliberations of all public bodies or agencies except to the extent that the demands of individual privacy outweigh the needs of the public right of disclosure. . . . *The committee intends by this provision that the deliberation and resolution of all public matters must be subject to public scrutiny.*

II Montana Constitutional Convention, Comments, p. 631 (emphasis added). This constitutional history establishes that the delegates were concerned with the dangers of a large complex government that could secretly undertake actions that affect the public.

However, the Constitutional Convention Delegates' legitimate concerns about the dangers of a secretive large government simply do not implicate the judiciary. The judiciary is perhaps unique among Montana's three branches of government in that it cannot secretly take actions that affect the public. Montana's Constitution expressly requires that "[a]

34

majority [of the Supreme Court] shall join in and pronounce decisions, which must be in writing." Art. VII, Sec. 3, Mont. Const. The decisions of Montana's Supreme Court are public, open to public scrutiny, and subject to challenge. Further, Montana Supreme Court justices are individually accountable for their decisions.

Although the dissent disregards the structure of the right to know provision, a cogent logical structure underlies and organizes the right to know provision's requirement that the deliberations of all public bodies be open unless "the demand of individual privacy clearly exceeds the merits of public disclosure." Art. II, Sec. 9, Mont. Const. The structure of the right to know provision presupposes that an independent entity will balance individual rights to privacy with the merits of public disclosure.

Montana's Constitutional Convention Delegates explicitly presumed that Montana's judiciary would be the entity that balances interests in privacy and public disclosure. During discussion of the right to know provision, Convention Delegate Cate proposed an amendment that would allow the legislature to "set the situations in which individual privacy exceeds the merits of public disclosure." V Montana Constitutional Convention, Verbatim Transcript (hereafter, transcript), p. 1671. Arguing in opposition to Delegate Cate's proposed amendment, Delegate Foster responded "Now, it was the thinking of the committee that, in fact, the courts would have to strike the balance between the merits of public disclosure and the merits of privacy, and our committee had faith in our courts to strike this balance. And we did not feel that this particular provision should be left to the Legislature to interpret."

35

*See* transcript at 1672. Even the delegates who voiced support for Delegate Cate's amendment recognized that the judiciary would balance individual privacy with the merits of public disclosure. For example, Delegate Loendorf expressed apprehension that if an agency barred his attending a public meeting on the grounds that his attendance would violate the privacy of an individual, he would "have to go to court and attempt to get an order allowing [him] to attend." *See* transcript at 1674. Arguing as well for Delegate Cate's proposed amendment, Delegate Brown cautioned that he could see where "this [right to know provision] would be abused by a County Commissioner, a Governor, other state officials, using this exception in our present Constitution to deny access to public documents. As a result, you'd have to go to court and end up ultimately with the Supreme Court." *See* transcript at 1677. Delegate Cate's amendment was defeated.

Our Constitutional Convention history clearly establishes that the Constitutional Delegates intended that Montana's *judiciary* balance individual privacy and the merits of public disclosure. I conclude that to construe Montana's judiciary as a "public body" would give an unconstitutional effect to the right to know provision. If this Court ruled that its conferences were open to the public, the Court would violate the constitutional mandate, which is clearly established by the structure of the right to know provision and by its constitutional history, that this Court balance individual needs for privacy with the merits of public disclosure. Again, in determining that the judiciary must balance those interests, the Constitutional Delegates recognized that the Court was no "public body" but rather was a

36

distinct branch of government.

I emphasize that the dissent has invested the right to know provision with an absolute reach. Under the dissent's interpretation, "public bodies" describe *any* group of people organized for a governmental purpose. If other parts of Montana's Constitution were also interpreted without regard for and independent of the structure of Montana's Constitution, we would have surprising results. Consider, for example, Article II, Section 12, which provides in part that the right to bear arms "in defense of [one's] own home, person, and property . . . *shall not be called in question*." Art. II, Sec. 12, Mont. Const. (emphasis added). If that constitutional provision were accorded an absolute reach, the phrase "shall not be called in question" would enable individuals to openly carry firearms in any situation or setting.[3] Defendants on trial for murder could insist upon the right to brandish firearms during their trials. Consider, too, Article II, Section 13, which provides that "[a]ll elections shall be free and open, and no power, civil or military, *shall at any time interfere* to prevent the free exercise of the right of suffrage." Art. II, Sec. 13, Mont. Const. (emphasis added). Individuals could read the phrase "shall [not] at any time interfere" to provide that they are free to vote whenever their consciences dictate, in November or in August, and at any time of the day or night. I submit that Montana's Constitution must be construed as a coherent integrated structure and that divesting phrases such as "public bodies" from their structured context also divests them of their intended and appropriate meanings.

---

[3] I recognize that this provision does not allow the carrying of concealed weapons.

Finally, the right to know provision upon which the dissent relies in arguing for open conferences guarantees not only the right to "observe the deliberations of all public bodies or agencies of state government" but also the right to "examine documents" of such public bodies. Art. II, Sec. 9, Mont. Const. If, as the dissent argues, the courts of this State are considered public bodies or agencies, then all internal working papers of the courts should be subject to public examination. Thus, when a justice of this Court prepares a proposed opinion in a matter before the Court, that proposed opinion (historically circulated only to other justices) would have to be made available to the public. If the proposed opinion pertained to a matter of public concern, members of the public and interest groups would be inspired to support or oppose the proposed opinion by writing letters to the justices, by conducting a media blitz, or by appearing en masse at the court conference where the proposed opinion is to be discussed. Perhaps more importantly, when parties to an appeal read such a proposed opinion, they will have seen the proverbial "writing on the wall" and be inclined to settle the case or take evasive action based on the views expressed in the proposed opinion, ignoring the fact that the votes could change in subsequent conferences when the proposed opinion is discussed. A defendant facing serious criminal charges who sees an adverse preliminary vote or proposed opinion may well jump bail or worse, again ignoring the fact that a preliminary vote or opinion might not accurately reflect the final published decision.

In contending that subjecting our decision making process to probing analysis by the

38

news media and to searching examination by the public would benefit this Court, the dissent has misconstrued the nature of judicial decision making and advanced the notion of an independent yet receptive-to-public-opinion judiciary that cannot withstand serious scrutiny. This Court's decisions already receive probing analysis by the media and searching examination by the public. Every decision of this Court is published and available to the public. Thus, there is a disingenuous character to the dissent's argument that this Court's opinions will benefit from public scrutiny, because that public scrutiny occurs with every decision of this Court. The real question then is not whether public scrutiny will benefit this Court: as a matter of judicial tradition, public scrutiny attends every judicial decision. Rather, the real question is whether public scrutiny of this Court's private *deliberations* is appropriate. For all the reasons that I discuss elsewhere in this concurring opinion, I am convinced that opening judicial deliberations to the public would damage the independence of this Court as a separate branch of government. Further, I believe that the dissent has embraced a rose-colored conception of judges that belies human reality. It cannot be true that justices will be positively influenced by opening our deliberations to the public yet also be true that justices, as elected officials, will never be negatively influenced by inevitable pressures to make decisions based on political considerations rather than legal principles. I emphasize that as a Court, we already receive the benefit of public scrutiny. There being no further benefit that we can anticipate, it would be senseless to invite probing analysis of our deliberations by the news media and by concerned members of the public in the

39

expectation that we will, if we humanly can, turn a deaf ear to those analyses when considering proposed opinions and preliminary votes on pressing social issues. Were I a litigant advocating an unpopular legal position, I would not want to advance my cause in such an atmosphere.

In my view, the framers of our Constitution did not envision the deliberations of judges being made in such a politically charged environment. Furthermore, the framers would not have chosen to abandon the centuries-old common-law tradition of confidential judicial deliberations without even five minutes of discussion to suggest that they intended such a momentous change in judicial decision making. In responding to concerns that the right to know provision might be interpreted to include juries, grand juries, and the deliberations of the Supreme Court, Delegate Dahood opined that no "court could conceivably give that interpretation to 'bodies.' " VII Montana Constitutional Convention, Verbatim Transcript, pp. 2499-2500. I agree with Justice Regnier that the absence of any further discussion on this point indicates that the delegates were persuaded by Delegate Dahood's comments and that they did not intend to take the unprecedented step of opening jury and court deliberations to the public. Although Justice Nelson eschews the suggestion that his application of the right to know, *without exception,* necessarily extends to the opening of jury deliberations, the fact is that juries clearly fit his definition of a public body subject to the right to know, in other words, a "group of individuals organized for a governmental purpose."

40

To sum up, I do not believe that this or any other court may strip itself of the privacy of its judicial deliberations yet serve as an effective, independent and distinct branch of government. The common-law tradition of private judicial conferences reflects this fundamental truth. Opening judicial conferences to public observation would thwart fruitful candid discussion of issues; expose justices to political pressures; and encourage parties to act upon conference votes and proposed opinions that often differ from final published judicial decisions. Moreover, established canons of judicial construction, the interdependent structure of Montana's Constitution, and Montana's Constitutional Convention history all lead to the conclusion that judicial deliberations fall outside the scope of the public's right to know. Contrary to the dissent, I am persuaded that this conclusion strengthens the right to know provision and its express concern for individual privacy interests. As the Constitutional Delegates wisely acknowledged, an independent judiciary is necessary to balance interests in privacy and public disclosure.

_W. William Leaphart_
Justice

Chief Justice J. A. Turnage, Justice Karla M. Gray and Justice Jim Regnier, join in Justice W. William Leaphart's foregoing special concurrence.

_J. A. Turnage_
Chief Justice

_Karla M. Gray_

_Jim Regnier_
Justices

41

# Districting and Apportionment Commission

## Membership

**JOE LAMSON**
612 TOUCHSTONE CIRCLE
HELENA, MT  59601
HOME:  442-7378
WORK:  444-3160
e-mail:  jlamson@state.mt.us
jlamson@mcn.net *(after 1/1/2000)*

**SHEILA RICE**
1501 4TH AVENUE NORTH
GREAT FALLS, MT  59401
HOME:  453-0198
WORK:  791-7506
e-mail:  SMRice@EWST.com

**ELAINE SLITER**
P.O. BOX 118
SOMERS, MT  59932
HOME:  857-2148
e-mail:  esliter@cyberport.net

**JACK REHBERG**
2922 GLENWOOD LANE
BILLINGS, MT  59102
HOME:  252-1350
e-mail:  JRehberg@aol.com



*Constitutional and Statutory Citation: Article V, section 14, Montana Constitution; 5-1-101 through 5-1-111, MCA*

The Montana Constitution and Montana Code Annotated provide that a Districting and Apportionment Commission be appointed in the legislative session preceding each federal population census.  Four members must be appointed by legislative leadership and those appointees must select the fifth member who is also the presiding officer.  The Constitution directs the Commission to "prepare a plan for redistricting and reapportioning the state into legislative districts and a plan for redistricting the state into congressional districts."

The Commission has specific deadlines for filing final plans for congressional and legislative districts once 2000 census figures are released during the first few months of 2001.  Prior to receiving census data and once the Commission's fifth member is chosen by the Supreme Court, the group will meet to make decisions on data and methodology and to adopt a timetable for preparing and submitting the redistricting plans.

## *Staff*

Susan Fox, Research Analyst, Legislative Services Division

John MacMaster, Attorney, Legislative Services Division

August 3, 1999

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the attached document was sent by United States mail, prepaid, to the following named:


DR JANINE PEASE-PRETTY ON TOP
LITTLE BIGHORN COLLEGE
P O BOX 370
CROW AGENCY  MT  59022


JOE LAMSON
612 TOUCHSTONE CIRCLE
HELENA  MT  59601


SHEILA RICE
1501  4TH AVE NORTH
GREAT FALLS  MT  59401


ELAINE SLITER
P O BOX  118
SOMERS  MT  59401


JACK REHBERG
2922  GLENWOOD LANE
BILLINGS  MT  59102


ED SMITH
CLERK OF THE SUPREME COURT

STATE OF MONTANA

BY: _____
Deputy