# FORRESTER *v.* WHITE

No. 86–761.   Argued November 2, 1987—Decided January 12, 1988

220

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, STEVENS, and SCALIA, JJ., joined, and in all but Part II of which BLACKMUN, J., joined.

*Mary Anne Sedey* argued the cause and filed briefs for petitioner.

*Rosalyn B. Kaplan,* Assistant Attorney General of Illinois, argued the cause for respondent. With her on the brief were *Neil F. Hartigan,* Attorney General, and *Roma Jones Stewart,* Solicitor General.*

JUSTICE O'CONNOR delivered the opinion of the Court.†

This case requires us to decide whether a state-court judge has absolute immunity from a suit for damages under 42 U. S. C. § 1983 for his decision to dismiss a subordinate court employee. The employee, who had been a probation officer, alleged that she was demoted and discharged on account of

---

*Brian L. Crowe* filed a brief for the Illinois Judges Association as *amicus curiae* urging affirmance.

†JUSTICE BLACKMUN joins in all but Part II of this opinion.

her sex, in violation of the Equal Protection Clause of the Fourteenth Amendment. We conclude that the judge's decisions were not judicial acts for which he should be held absolutely immune.

## I

Respondent Howard Lee White served as Circuit Judge of the Seventh Judicial Circuit of the State of Illinois and Presiding Judge of the Circuit Court in Jersey County. Under Illinois law, Judge White had the authority to hire adult probation officers, who were removable in his discretion. Ill. Rev. Stat., ch. 38, ¶204–1 (1979). In addition, as designee of the Chief Judge of the Seventh Judicial Circuit, Judge White had the authority to appoint juvenile probation officers to serve at his pleasure. Ill. Rev. Stat., ch. 37, ¶706–5 (1979).

In April 1977, Judge White hired petitioner Cynthia A. Forrester as an adult and juvenile probation officer. Forrester prepared presentence reports for Judge White in adult offender cases, and recommendations for disposition and placement in juvenile cases. She also supervised persons on probation and recommended revocation when necessary. In July 1979, Judge White appointed Forrester as Project Supervisor of the Jersey County Juvenile Court Intake and Referral Services Project, a position that carried increased supervisory responsibilities. Judge White demoted Forrester to a nonsupervisory position in the summer of 1980. He discharged her on October 1, 1980.

Forrester filed this lawsuit in the United States District Court for the Southern District of Illinois in July 1982. She alleged violations of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e et seq., and § 1 of the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U. S. C. § 1983. A jury found that Judge White had discriminated against Forrester on account of her sex, in violation of the Equal Protection Clause of the Fourteenth Amendment. The jury awarded her $81,818.80 in

compensatory damages under § 1983. Forrester's other claims were dismissed in the course of the lawsuit.

After Judge White's motion for judgment notwithstanding the verdict was denied, he moved for a new trial. The District Court granted this motion, holding that the jury verdict was against the weight of the evidence. Judge White then moved for summary judgment on the ground that he was entitled to "judicial immunity" from a civil damages suit. This motion, too, was granted. Forrester appealed.

A divided panel of the Court of Appeals for the Seventh Circuit affirmed the grant of summary judgment. The majority reasoned that judges are immune for activities implicating the substance of their decisions in the cases before them, although they are not shielded "from the trials of life generally." 792 F. 2d 647, 652 (1986). Some members of a judge's staff aid in the performance of adjudicative functions, and the threat of suits by such persons could make a judge reluctant to replace them even after losing confidence in their work. This could distort the judge's decisionmaking and thereby indirectly affect the rights of litigants. Here, Forrester performed functions that were "inextricably tied to discretionary decisions that have consistently been considered judicial acts." *Id.*, at 657. Unless Judge White felt free to replace Forrester, the majority thought, the quality of his own decisions might decline. The Court of Appeals therefore held that Judge White was absolutely immune from Forrester's civil damages suit. In view of this holding, the court found it unnecessary to decide whether the District Court had erred in granting Judge White's motion for a new trial.

In dissent, Judge Posner argued that judicial immunity should protect only adjudicative functions, and that employment decisions are administrative functions for which judges should not be given absolute immunity.

In *Goodwin* v. *Circuit Court of St. Louis County, Mo.*, 729 F. 2d 541, 549, cert. denied, 469 U. S. 828 (1984), the United

States Court of Appeals for the Eighth Circuit held that a judge was not immune from civil damages for his decision to demote a hearing officer. We granted certiorari, 479 U. S. 1083 (1987), to resolve the conflict.

## II

Suits for monetary damages are meant to compensate the victims of wrongful actions and to discourage conduct that may result in liability. Special problems arise, however, when government officials are exposed to liability for damages. To the extent that the threat of liability encourages these officials to carry out their duties in a lawful and appropriate manner, and to pay their victims when they do not, it accomplishes exactly what it should. By its nature, however, the threat of liability can create perverse incentives that operate to *inhibit* officials in the proper performance of their duties. In many contexts, government officials are expected to make decisions that are impartial or imaginative, and that above all are informed by considerations other than the personal interests of the decisionmaker. Because government officials are engaged by definition in governing, their decisions will often have adverse effects on other persons. When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct. In this way, exposing government officials to the same legal hazards faced by other citizens may detract from the rule of law instead of contributing to it.

Such considerations have led to the creation of various forms of immunity from suit for certain government officials. Aware of the salutary effects that the threat of liability can have, however, as well as the undeniable tension between official immunities and the ideal of the rule of law, this Court has been cautious in recognizing claims that government offi-

cials should be free of the obligation to answer for their acts in court. Running through our cases, with fair consistency, is a "functional" approach to immunity questions other than those that have been decided by express constitutional or statutory enactment. Under that approach, we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions. Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy, and the Court has recognized a category of "qualified" immunity that avoids unnecessarily extending the scope of the traditional concept of absolute immunity. See, *e. g.*, *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974); *Butz* v. *Economou,* 438 U. S. 478 (1978); *Harlow* v. *Fitzgerald,* 457 U. S. 800 (1982).

This Court has generally been quite sparing in its recognition of claims to absolute official immunity. One species of such legal protection is beyond challenge: the legislative immunity created by the Speech or Debate Clause, U. S. Const., Art. I, § 6, cl. 1. Even here, however, the Court has been careful not to extend the scope of the protection further than its purposes require. See, *e. g.*, *Gravel* v. *United States,* 408 U. S. 606, 622–627 (1972); see also *Hutchinson* v. *Proxmire,* 443 U. S. 111, 123–133 (1979); *Doe* v. *McMillan,* 412 U. S. 306 (1973); *United States* v. *Brewster,* 408 U. S. 501 (1972); *United States* v. *Johnson,* 383 U. S. 169 (1966); *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881). Furthermore, on facts analogous to those in the case before us, the Court indicated that a United States Congressman would not be entitled to absolute immunity, in a sex-discrimination suit filed by a personal aide whom he had fired, unless such immunity was afforded by the Speech or Debate Clause. *Davis* v. *Passman,* 442 U. S. 228, 246 (1979); see also *id.,* at 246, n. 25 (reserving question of qualified immunity).

Among executive officials, the President of the United States is absolutely immune from damages liability arising from official acts. *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982). This immunity, however, is based on the President's "unique position in the constitutional scheme," *id.*, at 749, and it does not extend indiscriminately to the President's personal aides, see *Harlow, supra*, or to Cabinet level officers, *Mitchell* v. *Forsyth*, 472 U. S. 511 (1985). Nor are the highest executive officials in the States protected by absolute immunity under federal law. See *Scheuer* v. *Rhodes, supra*.

## III

As a class, judges have long enjoyed a comparatively sweeping form of immunity, though one not perfectly well defined. Judicial immunity apparently originated, in medieval times, as a device for discouraging collateral attacks and thereby helping to establish appellate procedures as the standard system for correcting judicial error. See Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 Duke L. J. 879. More recently, this Court found that judicial immunity was "the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country." *Bradley* v. *Fisher*, 13 Wall. 335, 347 (1872). Besides protecting the finality of judgments or discouraging inappropriate collateral attacks, the *Bradley* Court concluded, judicial immunity also protected judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants. *Id.*, at 348.

In the years since *Bradley* was decided, this Court has not been quick to find that federal legislation was meant to diminish the traditional common-law protections extended to the judicial process. See, *e. g.*, *Pierson* v. *Ray*, 386 U. S. 547 (1967). On the contrary, these protections have been held to extend to Executive Branch officials who perform quasi-judicial functions, see *Butz* v. *Economou, supra*, at 513–514,

or who perform prosecutorial functions that are "intimately associated with the judicial phase of the criminal process," *Imbler* v. *Pachtman*, 424 U. S. 409, 430 (1976). The common law's rationale for these decisions—freeing the judicial process of harassment or intimidation—has been thought to require absolute immunity even for advocates and witnesses. See *Briscoe* v. *LaHue*, 460 U. S. 325 (1983); *Butz* v. *Economou*, 438 U. S., at 512.

One can reasonably wonder whether judges, who have been primarily responsible for developing the law of official immunities, are not inevitably more sensitive to the ill effects that vexatious lawsuits can have on the judicial function than they are to similar dangers in other contexts. Cf. *id.*, at 528, n. (REHNQUIST, J., concurring in part and dissenting in part). Although Congress has not undertaken to cut back the judicial immunities recognized by this Court, we should be at least as cautious in extending those immunities as we have been when dealing with officials whose peculiar problems we know less well than our own. At the same time, we cannot pretend that we are writing on a clean slate or that we should ignore compelling reasons that may well justify broader protections for judges than for some other officials.

The purposes served by judicial immunity from liability in damages have been variously described. In *Bradley* v. *Fisher, supra*, at 348, and again in *Pierson* v. *Ray, supra*, at 554, the Court emphasized that the nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have. As Judge Posner pointed out in his dissenting opinion below, this is the principal characteristic that adjudication has in common with legislation and with criminal prosecution, which are the two other areas in which absolute immunity has most generously been provided. 792 F. 2d, at 660. If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious,

would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. *Id.*, at 660–661. The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication. Nor are suits against judges the only available means through which litigants can protect themselves from the consequences of judicial error. Most judicial mistakes or wrongs are open to correction through ordinary mechanisms of review, which are largely free of the harmful side-effects inevitably associated with exposing judges to personal liability.

When applied to the paradigmatic judicial acts involved in resolving disputes between parties who have invoked the jurisdiction of a court, the doctrine of absolute judicial immunity has not been particularly controversial. Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges. Here, as in other contexts, immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches.

This Court has never undertaken to articulate a precise and general definition of the class of acts entitled to immunity. The decided cases, however, suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform. Thus, for example, the informal and *ex parte* nature of a proceeding has not been thought to imply that an act otherwise within a judge's lawful jurisdiction was deprived of its judicial character. See *Stump* v. *Sparkman*, 435 U. S. 349, 363, n. 12 (1978). Similarly, acting to disbar an attorney as a sanction for contempt of court, by invoking a power "possessed by all courts which have authority to admit attorneys to practice," does not become less judicial by virtue of an allegation of malice or corruption of motive. *Bradley* v. *Fisher*, 13 Wall., at 354.

As the *Bradley* Court noted: "Against the consequences of [judges'] erroneous or irregular action, from whatever motives proceeding, the law has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort." *Ibid.*

Administrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts. In *Ex parte Virginia*, 100 U. S. 339 (1880), for example, this Court declined to extend immunity to a county judge who had been charged in a criminal indictment with discriminating on the basis of race in selecting trial jurors for the county's courts. The Court reasoned:

> "Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. . . . That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, sheriffs, &c. Is their election or their appointment a judicial act?" *Id.*, at 348.

Although this case involved a criminal charge against a judge, the reach of the Court's analysis was not in any obvious way confined by that circumstance.

Likewise, judicial immunity has not been extended to judges acting to promulgate a code of conduct for attorneys. *Supreme Court of Virginia* v. *Consumers Union of United States, Inc.*, 446 U. S. 719 (1980). In explaining why legislative, rather than judicial, immunity furnished the appropriate standard, we said: "Although it is clear that under Virginia law the issuance of the Bar Code was a proper function of the Virginia Court, propounding the Code was not an act of adjudication but one of rulemaking." *Id.*, at 731. Similarly, in the same case, we held that judges acting to enforce the Bar Code would be treated like prosecutors, and thus would

be amenable to suit for injunctive and declaratory relief. *Id.*, at 734–737. Cf. *Pulliam* v. *Allen*, 466 U. S. 522 (1984). Once again, it was the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis.

## IV

In the case before us, we think it clear that Judge White was acting in an administrative capacity when he demoted and discharged Forrester. Those acts—like many others involved in supervising court employees and overseeing the efficient operation of a court—may have been quite important in providing the necessary conditions of a sound adjudicative system. The decisions at issue, however, were not themselves judicial or adjudicative. As Judge Posner pointed out below, a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other Executive Branch official who is responsible for making such employment decisions. Such decisions, like personnel decisions made by judges, are often crucial to the efficient operation of public institutions (some of which are at least as important as the courts), yet no one suggests that they give rise to absolute immunity from liability in damages under § 1983.

The majority below thought that the threat of vexatious lawsuits by disgruntled ex-employees could interfere with the quality of a judge's decisions:

> "The evil to be avoided is the following: A judge loses confidence in his probation officer, but hesitates to fire him because of the threat of litigation. He then retains the officer, in which case the parties appearing before the court are the victims, because the quality of the judge's decision-making will decline." 792 F. 2d, at 658.

There is considerable force in this analysis, but it in no way serves to distinguish judges from other public officials who

hire and fire subordinates. Indeed, to the extent that a judge is less free than most Executive Branch officials to delegate decisionmaking authority to subordinates, there may be somewhat less reason to cloak judges with absolute immunity from such suits than there would be to protect such other officials. This does not imply that qualified immunity, like that available to Executive Branch officials who make similar discretionary decisions, is unavailable to judges for their employment decisions. See, *e. g., Scheuer* v. *Rhodes,* 416 U. S. 232 (1974); *Davis* v. *Scherer,* 468 U. S. 183 (1984). Cf. *Harlow* v. *Fitzgerald,* 457 U. S., at 818. Absolute immunity, however, is "strong medicine, justified only when the danger of [officials' being] deflect[ed from the effective performance of their duties] is very great." 792 F. 2d, at 660 (Posner, J., dissenting). The danger here is not great enough. Nor do we think it significant that, under Illinois law, only a judge can hire or fire probation officers. To conclude that, because a judge acts within the scope of his authority, such employment decisions are brought within the court's "jurisdiction," or converted into "judicial acts," would lift form above substance. Under Virginia law, only that State's judges could promulgate and enforce a Bar Code, but we nonetheless concluded that neither function was judicial in nature. See *Supreme Court of Virginia* v. *Consumers Union, supra.*

We conclude that Judge White was not entitled to absolute immunity for his decisions to demote and discharge Forrester. In so holding, we do not decide whether Judge White is entitled to a new trial, or whether he may be able to claim a qualified immunity for the acts complained of in Forrester's suit. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*