# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
October 10, 2001 Session

## RENE C. MERCER, ET AL. V. HCA HEALTH SERVICES OF TENNESSEE, INC., ET AL.

### Appeal from the Circuit Court for Davidson County
### No. 98C-3458    Barbara N. Haynes, Judge

---

### No. M2000-02785-COA-R3-CV - Filed February 7, 2002

---

A widow claimed that her husband's suicide was caused by the negligence of the defendant hospital and the defendant psychiatrist in releasing him prematurely from involuntary commitment. The trial court granted summary judgment to the defendants, finding that the hospital was obligated to release the patient when ordered to do so by the psychiatrist, and that the psychiatrist was entitled to absolute immunity for actions undertaken under the involuntary commitment statutes. We reverse the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J. and J. S. DANIEL, SP. J., joined.

Daniel L. Clayton, Nashville, Tennessee and Steven R. Walker, Memphis, Tennessee, for the appellants, Rene C. Mercer, Sarah Lynne Mercer and David Leigh Mercer.

C. J. Gideon, Jr., Dixie W. Cooper, and Christi D. Griffin, Nashville, Tennessee, for the appellee, HCA Health Services of Tennessee, Inc.

Phillip North and Robert Briley, Nashville, Tennessee, for the appellee, Steven R. Nyquist, M.D.

### OPINION

### I. A SUICIDE

On December 22, 1997, John Mercer was brought to the emergency room at Summit Medical Center, a hospital operated by HCA Health Services of Tennessee. Mr. Mercer had threatened to commit suicide. He had also imbibed two quarts of liquor a day for the previous three days, and had a potentially lethal blood alcohol level of .40. He was admitted to the hospital, where psychiatrist

Dr. Steven Nyquist ordered that Mr. Mercer be put on suicide watch. The following day, Dr. Nyquist obtained an emergency commitment order from the General Sessions Court, which authorized the hospital to hold Mr. Mercer until December 31, 1997.

Mr. Mercer's prior history included depression, psychiatric admissions, suicide threats, and head injury. He and his wife Rene had recently separated. He was living alone, and was under financial stress. Even though this information was available as a result of interviews with the patient by HCA staff members, and through HCA's own medical records, Dr. Nyquist was apparently not made aware of very much of Mr. Mercer's history when he ordered the patient discharged on December 24. Mr. Mercer was found dead in his home of a self-inflicted gunshot wound on Christmas Day.

On December 17, 1998, Rene Mercer, individually and on behalf of the couples' two minor children, filed a Complaint in the Circuit Court of Davidson County, naming Dr. Nyquist and HCA Health Services of Tennessee d/b/a Summit Hospital as defendants. The plaintiffs claimed that Dr. Nyquist had acted negligently in discharging Mr. Mercer, and that the discharge led directly to his death. They also claimed that Dr. Nyquist's decision was induced in part by the negligent failure of nurses and social workers employed by HCA to notify the psychiatrist of numerous factors that would have alerted him to the potential danger of such a discharge.

Both defendants filed answers, followed by separate motions for summary judgment. The defendant healthcare company claimed that once Dr. Nyquist ordered the discharge of Mr. Mercer, it had a legal duty to release him, and that as a matter of law it could not be held liable for so doing. The defendant psychiatrist claimed that because he was operating under the Involuntary Admission statutes, his discharge of Mr. Mercer amounted to a quasi-judicial act, and he was therefore entitled to absolute immunity.

The plaintiffs filed Memoranda in Opposition to both motions, accompanied by the affidavits of two psychiatrists and two psychiatric nurses. The affiants stated that they had reviewed Mr. Mercer's medical records, and the policies and procedures of Summit Medical Center. After describing in some detail the deficiencies in the process that led to Mr. Mercer's discharge, they declared that the actions of Dr. Nyquist and the HCA staff fell below the recognized standards of acceptable professional practice, and were the causes in fact of Mr. Mercer's death.

Following a hearing on HCA's motion, the trial court agreed with the defendant that its employees were only performing their legal duty when they discharged Mr. Mercer on the orders of Dr. Nyquist, and that HCA was therefore entitled to judgment as a matter of law. The court's summary judgment order, filed on September 20, 2000, granted the defendant's request to certify the judgment as final under Tenn. R. Civ. Proc. 54.02. The plaintiffs promptly filed a Notice of Appeal.

Dr. Nyquist's Motion for Summary Judgment was heard on October 23, 2000, and was subsequently granted as well. The trial court acknowledged that the defendant's immunity argument was a question of first impression in Tennessee. The court declared, however, that it was important

for mental health professionals to be involved in the legal process for involuntary commitment and discharge of persons with mental illness, and that granting them immunity for their actions and decisions would promote the broad public policy underlying the process. The court accordingly deemed Dr. Nyquist's discharge of Mr. Mercer to be a quasi-judicial act, and declared him to be protected by judicial immunity. The court also certified this judgment as final under Tenn. R. Civ. Proc. 54.02, and the plaintiffs filed another Notice of Appeal. On January 9, 2001, the Court of Appeals ordered consolidation of the two pending appeals.

## II. JUDICIAL AND QUASI-JUDICIAL IMMUNITY

The standards for summary judgment are well-known, and need not be discussed in great detail here. To demonstrate entitlement to summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Rule 56.04, Tenn. R. Civ. Proc.; *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993).

In the great majority of summary judgment cases reviewed by this court, the question for our decision has been whether the allegations of the non-moving party are sufficient to raise a genuine issue of material fact such as would preclude summary judgment for the moving party. In this case, however, it appears that the affidavits of the plaintiffs' experts have raised questions of material fact as to the existence of all the elements of negligence in the context of a medical malpractice action. The defendants therefore cannot demonstrate an entitlement to summary judgment except on the basis of immunity or some other legal defense that would allow them to avoid entirely the question of negligence.

It has long been a part of the common law that judges enjoy absolute immunity for acts performed in the exercise of their judicial functions. *Webb v. Fisher*, 109 Tenn. 701, 72 S.W. 110 (1902). Neither the correctness of a judge's decisions, nor his motives, affect this immunity. *Heath v. Cornelius*, 511 S.W.2d 683 (Tenn. 1974). A more limited form of immunity extends to testifying witnesses, including those who testify by sworn affidavit. *Dyer v. Dyer*, 156 S.W.2d 445 (Tenn. 1941). We note that although witnesses cannot be subjected to civil liability for their testimony, they may in appropriate cases be prosecuted for perjury.

Generally, individuals who act both at the direction of the court, and in aid of the court's functioning, such as guardians ad litem, enjoy absolute immunity from liability for their acts. *Winchester v. Little,* 996 S.W.2d 152 (Tenn. Ct. App. 1998). However, this only applies when the actions involve the exercise of discretion. In *Miller v. Niblack,* 942 S.W.2d 533 (Tenn. Ct. App. 1996), this court found that a laboratory that negligently performed a paternity blood test was not entitled to immunity, even though the trial court had ordered the test, because the court's order allowed no room for discretion as to the type of tests to be performed, the manner of performing them, or the interpretation of the results.

Outside of the courts, members of official bodies that perform judicial functions are entitled to what is sometimes called quasi-judicial immunity. These include the Board of Law Examiners,

*Hampton v. Tennessee Board of Law Examiners*, 770 S.W.2d 755 (Tenn. Ct. App. 1988), the Board of Professional Responsibility, *Cawood v. Davis*, 680 S.W.2d 795 (Tenn. Ct. App. 1984), and the Board of Claims, *Schoenly v. Nashville Speedways, Inc.* 344 S.W.2d 349 (Tenn. 1961).

Judicial and quasi-judicial immunities exist only under circumstances where they appear to be absolutely necessary for the proper functioning of courts and other bodies. It is significant that the United States Supreme Court has declared its reluctance to extend immunities beyond those mandated by constitutional and statutory requirements, noting in particular that "[a]bsolute immunity is 'strong medicine,' justified only when the danger of officials' being deflected from the effective performance of their duties is very great." *Forrester v. White*, 484 U.S. 219, 230 (1988).

## III. THE INVOLUNTARY COMMITMENT STATUTES

The statutes that governed involuntary commitment at the time of the events discussed above[1] included a section that dealt with the liabilities and immunities of parties acting under its provisions. Subsections (a) and (b) of Tenn. Code. Ann. § 33-3-102 set out criminal penalties for intentionally causing an individual to be detained under its provisions without probable cause, while Subsection (c) entitled hospital administrators and others to rely in good faith on representations made by qualified individuals for involuntary admissions. Subsection (d) of that statute read:

> All persons acting in good faith, reasonably and without negligence in connection with the preparation of petitions, applications, certificates or other documents or the apprehension, detention, discharge, examination, transportation or treatment of an individual under the provisions of this title shall be free from all liability, civil or criminal, by reason of such acts.

[Acts 1965, ch. 38, § 6].

The appellees urge us to ignore Subsection (d), or to treat it as meaningless verbiage, since an individual who is not negligent would not be liable in any case. Although it may be difficult to divine the legislature's purpose in enacting Subsection (d), it appears to us that they chose not to grant immunity to individuals who have acted negligently in the involuntary commitment process.

The involuntary commitment statutes as a whole describe a series of escalating steps for the detention of individuals against their will, when required for emergency mental health diagnosis, evaluation, and treatment. Only the first few of these steps are relevant to our inquiry.

Under former Tenn. Code. Ann. § 33-6-103(a) (and current Tenn. Code. Ann. § 33-6-402 and 403), a physician or a police officer can take a person into custody for immediate examination

---

[1] The involuntary commitment statutes were modified and renumbered after the events that gave rise to this lawsuit. In the following discussion, we refer to those statutes in accordance with their prior numbering. Where the statutes are substantially unchanged, we have sometimes referred to them by their current designations as well.

without a civil order or warrant if the person is mentally ill and he "poses an immediate substantial likelihood of serious harm" to himself or to others "because of the mental illness."[2] If a physician determines after examination that the person is subject to involuntary hospital admission, then he must complete a certificate of need, showing the factual foundation for his conclusions. Tenn. Code. Ann. § 33-6-103(h) (now § 33-6-404).

The certificate is submitted to a general sessions court, which upon a finding of probable cause, "may order the defendant admitted for not more than five (5) days from the date of the order, excluding Saturdays, Sundays and holidays, for emergency diagnosis, evaluation and treatment pending a probable cause hearing . . . ." Tenn. Code. Ann. § 33-6-103(l) (now 33-6-413).

It is not disputed that a physician acting under this statute is entitled to release a patient after obtaining an order from the General Sessions court, and before the probable cause hearing. In fact, Tenn. Code. Ann. § 33-6-109 read, "a patient admitted to a hospital under any provision of this title other than Tenn. Code. Ann. § 33-6-104 shall be discharged" if "he no longer meets the standards under which the admission took place, AND the patient's detention is not otherwise authorized under the admission statute." *See* current Tenn. Code. Ann. § 33-6-705.

Dr. Nyquist argues that Tenn. Code. Ann. § 33-6-109 and related statutes showed a clear legislative bias towards personal liberty and against involuntary commitment. The appellee testified that he conducted several interviews with Mr. Mercer and that he concluded on the basis of their conversations that the patient was not mentally ill. He argues that once he made that determination, he had no choice under Tenn. Code. Ann. § 33-6-109 but to discharge his patient. It appears to us, however, that the appellants are entitled to inquire into the process whereby Dr. Nyquist determined Mr. Mercer's mental status.

## IV. CONSTITUTIONAL AND PUBLIC POLICY CONSIDERATIONS

Dr. Nyquist argues that confining an individual against his will implicates Article 1, § 8 of the Tennessee Constitution, which prohibits such imprisonment except "by the judgment of his peers or the law of the land." Since judges involved in the conviction and sentencing of criminals may not be prosecuted for judicial acts that lead to imprisonment or to release for an accused person, he argues that a doctor who is entrusted with a decision that involves a similar loss of liberty should enjoy the same legal immunity.

We note that another section of our Constitution, Article I, § 17, provides that "every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law." Thus, if we declared Dr. Nyquist to be entitled to judicial immunity, we would be depriving the Mercer family and others similarly situated of a remedy to which they would otherwise be constitutionally entitled. *See Whisnant v. Byrd*, 525 S.W.2d 152 (Tenn. 1975).

---

[2]Tenn. Code. Ann. § 33-6-403 adds "or serious emotional disturbance."

Courts may sometimes be forced to choose between competing constitutional principles, but judicial immunity (unlike legislative immunity, see Article II, § 13) is not a constitutional requirement. It is a common law rule of venerable lineage, while quasi-judicial immunity is sometimes (but not in the circumstances present here) a statutory requirement. In the absence of any constitutional or statutory authority to extend judicial immunity to health providers acting under the involuntary commitment statutes, we are left with the public policy argument as the sole rationale for the trial court's decision.

We must note, however, that our courts have stated on more than one occasion that the public policy of this state is to be found in its Constitution and statutes, and that the judiciary has a very limited power to declare what public policy is, in the absence of an unambiguous constitutional, statutory, or regulatory provision. *See Stein v. Davidson Hotel Co.*, 945 S.W.2d 714 (Tenn. 1997), *Whisnant v. Byrd*, 525 S.W.2d 152 (Tenn. 1975).

Further, even if we were required to declare what the public policy of this state should be in regard to judicial immunity for physicians involved in commitment proceedings, we think the arguments in favor of immunity are less compelling than the arguments against it. The trial court stated that giving physicians "judicial immunity for decisions made and actions taken during the involuntary committal and discharge process will promote the broad public policy underlying the judicial proceeding." There is, however, more than one way to look at the effects of liability and immunity on the conscientious performance of public duties. In *Forrester v. White*, 484 U.S. 219 (1988), the United States Supreme Court recognized the complexity of the question:

> "Suits for monetary damages are meant to compensate victims of wrongful actions and to discourage conduct that may result in liability. Special problems arise, however, when government officials are exposed to liability for damages. To the extent that the threat of liability encourages these officials to carry out their duties in a lawful and appropriate manner, and to pay their victims when they do not, it accomplishes exactly what it should. By its nature, however, the threat of liability can create perverse incentives that *inhibit* officials in the proper performance of their duties." (emphasis in the original)

284 U.S. at 230.

In *Forrester*, the Supreme Court dealt with the question of whether an Illinois Circuit Court judge was immune from a civil rights discrimination lawsuit for his action in discharging a female employee of the court on account of her sex. The court held that he was not, and drew a distinction between judicial acts (for which a judge is entitled to immunity) and the "administrative, legislative or executive functions that judges may on occasion be assigned by law to perform." 284 U.S. at 227.

The Court spoke in terms of a functional approach to the question of immunity, declaring that the function for which it is sought is a more important consideration in determining whether immunity is appropriate than is the title of the individual exercising the function. The appellant has

seized on this question of a functional approach, and argued that the function of a physician in confining a patient against his will is almost identical to the function of a judge sentencing a convicted criminal to prison. However, the *Forrester* Court also said,

> ". . . we examine the functions with which a particular official, or class of officials has been lawfully entrusted, and we seek to evaluate the effect that various forms of liability would likely have on the appropriate exercise of those functions. Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy . . . ."

284 U.S. at 224.

When we analyze the possible effects of liability versus immunity on involuntary commitment decisions, we discover dangers in both. The trial court inferred (without any evidentiary support that we can find) that it would be difficult to find physicians willing to make involuntary commitment decisions in the absence of a guarantee of absolute protection against lawsuits. Of more significance, perhaps, is the possibility that a medical professional faced with the danger of liability may allow that concern to take priority over the exercise of sound medical judgment. But one who is endowed with immunity for his acts will be able to neglect his/her medical duties without fear of consequences. We find pitfalls along both pathways.

Decisions to discharge or hold patients are discretionary ones, and in that respect they are somewhat akin to those for which judges and certain other government officials receive immunity. But one vital difference is that there are no recognized or ascertainable standards of care judges and government officials must adhere to in reaching their decisions, that are analogous to those that apply to medical professionals. Faithful adherence to these standards provides an effective shield against liability for the conscientious medical professional. The stringent evidentiary requirements of the medical malpractice statutes provide further protection for such an individual.

Tenn. Code. Ann. § 29-26-115(a) declares that the plaintiff has the burden of proving the relevant standard of care, deviation from the standard, and that the injury complained of resulted from that deviation. These elements can only be proven by expert testimony, except where the act of alleged malpractice lies within the knowledge of ordinary laymen. *Stokes v. Leung*, 651 S.W.2d 704 (Tenn. Ct. App. 1982); *Baldwin v. Knight*, 569 S.W.2d 450 (Tenn. 1978).

Tenn. Code. Ann. § 29-26-115(b) sets out stringent requirements of licensure and practice for healthcare professionals to satisfy before they are permitted to testify as to the necessary elements. Section (c) of the same statute states that there will be no presumption of negligence in a medical malpractice action, while Section (d) requires the court to instruct the jury in such an action that "injury alone does not raise a presumption of the defendant's negligence." Thus, the outcome of a medical malpractice lawsuit against a physician who has made an involuntary commitment decision may not be determined by the correctness of the decision or by its result, but

solely by the question of whether the defendant followed the relevant standard of care in reaching it.

It appears to us that these statutes meet the concerns voiced by the Supreme Court in *Forrester v. White*, supra, far more effectively than blanket immunity would. Accordingly, we conclude that considerations of public policy do not require a grant of judicial immunity for doctors involved in involuntary commitment proceedings.

## V. THE ROLE OF HCA HEALTH SERVICES

As we stated above, the trial court granted summary judgment to HCA Health Services because it found that the defendant had a legal duty under Tenn. Code. Ann. § 33-6-109 to discharge Mr. Mercer once Dr. Nyquist ordered it. The plaintiffs vigorously disputed this interpretation of the statute, and argued that Tenn. Code. Ann. § 33-6-103 and Tenn. Code. Ann. § 33-6-108 placed the ultimate responsibility for discharge on the superintendent of the hospital. We do not think it necessary to express an opinion on this question of statutory interpretation, however, because it appears to us that the plaintiffs have alleged facts sufficient to support a claim against HCA upon an entirely different basis.

According to Dr. Nyquist's deposition, the responsibility for Mr. Mercer's care lay with a treatment team led by the psychiatrist, and which included registered nurses and a social worker employed by HCA. Two registered psychiatric nurses retained as experts testified that the standard of care required the treatment team to assess Mr. Mercer's potential for suicide, to document their observations, and to communicate those observations to each other and to Dr. Nyquist. They concluded, after examining the hospital's records that this was not done, even though Mr. Mercer presented numerous risk factors for possible suicide.

Among other things, team members apparently failed to review the medical records of Mr. Mercer's previous hospitalization, despite hospital policy requiring such review. Those records would have revealed a history of head trauma, which according to the affidavits of the two expert psychiatrists, increases the risk of suicide because of poor judgment. Also, social worker Glenn Vann learned from Mrs. Mercer that there had been a similar episode of alcohol intoxication and threats of suicide the previous Christmas, but he did not convey the information to Dr. Nyquist. If he had done so, Dr. Nyquist might have been less likely to believe Mr. Mercer's denial of suicidal ideation.

Dr. Nyquist himself testified at his deposition that to determine the mental status of a patient, he needed to know about his "psychosocial world", as well as "elements of current medical history, past medical history, of family psychiatric history, personal psychiatric history." This testimony was consistent with the explanation of the standard of care presented by the plaintiff's psychiatric experts. The record indicates, however, that Dr. Nyquist's determination that Mr. Mercer should be discharged was based solely on a few interviews he conducted with the patient. He also testified that

prior to releasing Mr. Mercer, he never attempted to obtain any other records involving his previous hospitalizations.

Dr. Nyquist's testimony raises the question as to what extent the alleged negligence in this case should be imputed to HCA for the failure of its employees to convey important information to the psychiatrist, and to what extent Dr. Nyquist was obligated to seek or request this information from the treatment team. It does not, however, negate the questions of material fact raised by the allegations of negligence against HCA.

## VI.

The judgment of the trial court is reversed. Remand this cause to the Circuit Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal equally between the appellees, HCA Healthcare Services of Tennessee and Steven R. Nyquist, M.D.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.