**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0723n.06
Filed: November 24, 2008

**No. 07-1576**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **S. A. VAKILIAN**, Administrator of the Estate of Mohammad M. Vakilian, M.D., | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| *Plaintiff-Appellant*, | ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| | ) | **O P I N I O N** |
| **WESLEY SHAW; RICHARD L. KOENIGSKNECHT; JOHN DOE, I; JOHN DOE, II**, Jointly and Severally, | ) ) | |
| *Defendants-Appellees*. | | |

BEFORE:    BOGGS, Chief Judge; COLE and COOK, Circuit Judges

**COLE, Circuit Judge.**  After criminal charges for Medicaid fraud were dismissed against the late Mohammad Vakilian, M.D., the administrator of his estate, S.A. Vakilian, (decedent and administrator collectively, "Vakilian") sued Wesley Shaw ("Shaw"), an investigator in the Michigan Attorney General's Office, and Richard Koenigsknecht ("Koenigsknecht"), an Assistant Attorney General for the State of Michigan, (collectively, "Defendants") for violating Vakilian's constitutional rights during his investigation and prosecution.  Vakilian alleged prosecution without probable cause in violation of 42 U.S.C. § 1983 and ethnic and national origin discrimination in violation of 42 U.S.C. § 1985(3).  The district court granted Koenigsknecht absolute prosecutorial immunity and

1

dismissed both claims against him. The district court denied summary judgment to Shaw based on qualified immunity. On a previous appeal to this Court, we reversed the district court's denial of summary judgment to Shaw on the § 1983 claim and dismissed that claim. We affirmed the district court's denial of summary judgment on the § 1985(3) claim against Shaw, allowing that claim to proceed to trial. Prior to trial, Vakilian moved to reinstate his § 1983 claims against both defendants but was denied. At trial on the § 1985(3) claim, the jury returned a verdict for Shaw, finding no equal protection violation. Vakilian appeals the denial of his motion to reinstate the § 1983 claims and the grant of summary judgment to Koenigsknecht based on absolute immunity. He also seeks a new trial based on an allegedly erroneous jury instruction. We **AFFIRM** the district court in all respects.

## I. BACKGROUND

### A. Factual history—investigation and prosecution of Vakilian

*1. Shaw's investigation*

During a 1993 investigation of Health Stop Medical Clinics ("Health Stop"), a group of four clinics located in southeast Michigan, Shaw learned of an illegal kickback scheme involving the payment of monthly bonuses to physicians based on the number of medical procedures and tests they ordered—an arrangement in which physicians ordered unnecessary tests to increase their bonuses. Search warrants were served and executed at Health Stop's offices. Documents seized included cancelled payroll and bonus checks and sheets tallying the number of tests ordered by each doctor. Shaw interviewed non-physician employees who explained how the kickbacks had been calculated, told Shaw that kickbacks had been paid to physicians at all four Health Stop clinics, and stated that

2

the clinic's director and owner, Dr. Sharif Baig, had held at least one meeting, which he had

requested all physicians to attend, where the kickback scheme was discussed. The employees whom

Shaw interviewed did not specifically mention Vakilian.

In July 1996, Shaw prepared a draft arrest warrant request charging many of Health Stop's

physicians with violating the kickback provisions of Michigan's Medicaid False Claim Act

("MFCA"), which provides:

> A person who solicits, offers or receives a kickback or bribe in connection
> with the furnishing of goods or services for which payment is or may be made
> in whole or in part pursuant to a program established under Act. No. 280 of
> the Public Acts of 1939, [] as amended, who makes or receives the payment,
> or who receives a rebate of a fee or charge for referring an individual to
> another person for the furnishing of the goods and services is guilty of a
> felony . . . .

*Mich. Comp. Laws* § 400.604. The draft warrant also included a charge of conspiracy to violate the

MFCA. Shaw claims that for this initial draft, he included the physicians whom he believed had

been involved in the scheme based on the information he had gathered up to that point and that

Vakilian was not included because Shaw was not then aware that Vakilian had received kickbacks.

Shaw also did not include two white, female doctors—Dr. Karen Beasley and Dr. Nancy Sue

Eos—in his draft warrant, even though he was aware that each of them had received some kickbacks.

Dr. Eos informed Shaw that she had been aware of the kickback scheme, while Dr. Beasley claimed

that the bonuses were based on overtime work. Dr. Beasley worked at Health Stop for only about

three months and Dr. Eos for only four to five months. Of the physicians for whom there was

evidence of receipt of kickbacks, the two of them received the smallest amounts.

Koenigsknecht testified that among the reasons Drs. Beasley and Eos were not charged were

that the amount of kickbacks they had received was small and that they had agreed to cooperate with

the investigation. Although Koenigsknecht could not recall specifically, he said it likely would have been his decision to approach these two physicians to ask whether they would cooperate, and this decision would have been made prior to the writing of Shaw's draft warrant on July 17, 1996. Koenigsknecht thought he remembered that Dr. Beasley or Dr. Eos did testify later in a trial, involving physicians other than Vakilian, stemming from the kickback investigation of Health Stop.

In August 1996, Shaw received a compilation of data from an Internal Revenue Service ("IRS") agent named Steven Moore who was assisting in the investigation. The compilation showed the amount of kickbacks each physician had received by month, the amount of kickbacks to each physician that could be proved using cancelled checks, and the total amount of kickbacks each physician had received. This data revealed that Vakilian had received and cashed kickback checks totaling approximately $4,600. In spite of the fact that this was a relatively small amount, and in spite of the fact that Shaw did not investigate whether the tests Vakilian (or any other physician) had ordered were medically unnecessary, Shaw included Vakilian and one other physician implicated by Moore's compilation in the warrant request. On January 21, 1997, Shaw submitted a final warrant request to Koenigsknecht.

*2. Koenigsknecht's role in the case*

Throughout the investigation, Koenigsknecht met with Shaw and other investigators to discuss the status of the investigation, including who had been interviewed and what had been learned, and to suggest areas for further investigation. Shaw occasionally went to Koenigsknecht with legal questions relevant to the investigation. Koenigsknecht reviewed Shaw's draft warrant request and reviewed IRS agent Moore's analysis. At some point, Shaw and Koenigsknecht

discussed the evidence and pared the number of suspects to be charged down to ten. Shaw testified that Koenigsknecht instructed Shaw to add Vakilian and at least one other physician to the warrant request based on Moore's analysis. Koenigsknecht made the final decisions about whom to charge. The doctors charged were all male and, with one exception, had names suggesting foreign origins.

At trial Shaw testified that he and Koenigsknecht had interviewed Dr. Beasley at her office prior to Shaw's drafting of the July 17, 1997 draft arrest warrant. Koenigsknecht stated at his deposition and again at trial that he had not interviewed any witnesses prior to the issuance of the arrest warrants. When confronted with notes showing that he had interviewed Dr. Beasley, Koenigsknecht said he had no recollection of doing so and that it would have been out of keeping with his normal practice. However, Koenigsknecht stated that in special circumstances in which a potential defendant comes forward and wants to provide information, he may interview the witness before an arrest warrants have been issued. Shaw testified that the decision not to charge Dr. Beasley was made at some point after he and Koenigsknecht interviewed her. The purpose of the interview was to determine what information she could provide and whether she would be a witness for the prosecution.

### 3. Disposition of the criminal prosecution of Vakilian

After receiving Koenigsknecht's approval, Shaw obtained arrest warrants on February 11, 1997. To obtain the warrant for Vakilian, Shaw swore that his investigation had

> [r]evealed that [Vakilian] received additional money above what he's supposed to get; ordering excessive amounts of tests. And records were kept each month on the amount of tests that they were performing and a separate check was written to these doctors for these services . . . . There was agreement between the doctor and the

6

owner, Dr. Baig, to per - - perform these services and that he would receive money
for his services.

(Joint Appendix ("JA") 568.)  After Vakilian was arrested, he maintained his innocence, claiming

he had been unaware that the monthly bonuses bore any relation to the number of tests or other

procedures he ordered.  He successfully moved to quash the information against him for lack of

evidence, and the criminal case was dismissed.  The State appealed, and the Michigan Court of

Appeals affirmed, holding that the prosecution had failed to put forth evidence that Vakilian was

aware the monthly bonuses were kickbacks.

Vakilian died in 2000.  S.A. Vakilian, his son, maintains that Vakilian never knew about the

kickback scheme and that Dr. Baig told Vakilian the bonus payments were based on overtime hours

and the clinic's productivity.  Vakilian's estate filed the complaint in this action against Shaw and

Koenigsknecht under §§ 1983 and 1985(3) in the Eastern District of Michigan claiming that the

Defendants made misrepresentations to obtain the arrest warrant, and that the unfounded prosecution

severely damaged his father's career and hastened his death.

**B.     Procedural history**

*1. Summary judgment*

Defendants moved for summary judgment claiming that both Shaw and Koenigsknecht were

entitled to absolute and qualified immunity.  The district court found that Shaw was entitled to

neither and denied his motion but that Koenigsknecht was entitled to absolute prosecutorial

immunity.  Defendants took an interlocutory appeal on the denial of summary judgment to Shaw.

This Court reversed in part, finding that Shaw was entitled to qualified immunity on the §1983 claim

but that the district court had properly denied him summary judgment on the § 1985(3) claim. *Vakilian v. Shaw*, 335 F.3d 509 (6th Cir. 2003) ("*Vakilian I*"). In dismissing the § 1983 claim against Shaw, we held that probable cause would have existed for the warrant even if Shaw had not made the allegedly false statements because Michigan law at the time did not require knowledge of or intent to receive kickbacks—it only required receipt of kickbacks. *Vakilian I*, 335 F.3d at 518. Vakilian cross-appealed the finding of absolute immunity for Koenigsknecht. We exercised pendent jurisdiction only as to the § 1983 claim, affirming that Koenigsknecht could not be liable for the same reason Shaw could not. *Vakilian I*, 335 F.3d at 521-22. We declined to exercise pendent jurisdiction to review whether Koenigsknecht was entitled to absolute immunity protecting him from Vakilian's § 1985(3) claim. *Id*. at 522.

Following our decision, Vakilian moved the district court to reinstate his § 1983 claim against Shaw, pointing to statements by Defendants, some post-dating our decision, that they believed at the time they obtained the warrant that they were required to show that Vakilian knew of the kickback scheme. Vakilian also claimed Defendants' counsel had misled the Sixth Circuit in oral argument by denying that Defendants had personally believed they were required to show knowledge to obtain a warrant for Vakilian's arrest. The district court denied the motion. The case proceeded to trial on the equal protection claim against Shaw, and the jury found in Shaw's favor. Vakilian again moved the district court to reinstate both the § 1983 and § 1985(3) claims against Koenigsknecht, claiming that testimony elicited at trial showed that Koenigsknecht was not entitled to absolute immunity. The district court denied the motion.

8

2. *The contested jury instruction*

At trial, during arguments over Shaw's motion for a directed verdict, a dispute arose as to whether Defendants had conceded that Drs. Beasley and Eos were American-born. Vakilian's counsel argued,

> [t]he claim has always been and there has never been a denial that [Drs. Beasley and Eos] were American born, and Shaw testified that from his interview with them they were both Caucasian and neither one of them had an accent. The reasonable inference is, in the absence of evidence to the contrary, that they were different in their national origin than Dr. Vakilian.

(JA 1168.) The district judge denied the motion for a directed verdict, but the issue arose again in arguments over jury instructions. Shaw's attorney requested an instruction stating that, contrary to Vakilian's attorney's statements in his closing argument, Defendants had never conceded that Drs. Beasley and Eos were American-born. Vakilian's counsel, in turn, requested an instruction stating that Plaintiffs consistently had asserted that Beasley and Eos were American-born and that Defendants had never denied it. The judge proposed an instruction stating "whether Beasley and Eos were American born cannot be what? Determined on arguments." (JA 1186.) Shaw's attorney then proposed an instruction that facts "[cannot] be established by [Vakilian's attorney's] argument." (*Id*.) Vakilian's attorney objected and proposed the instruction: "[y]ou should determine it from the evidence in the case." (*Id*.) The judge agreed with this suggestion, and Vakilian's attorney stated "[t]hank you." (*Id*.) The record suggests that both attorneys were satisfied with this resolution.

The jury instruction was given as agreed:

> Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments, and at any other times or at other times [sic] is intended to help you interpret the evidence, but it is not evidence.
> There was argument here about whether Beasley and, Drs. Beasley and Eos were American born. It cannot be established by counsels's [sic] argument that they were American born. But must be determined from evidence received in the case.

(*Id*. 1063.) The jury began deliberations in the afternoon. The following morning, Vakilian's counsel submitted a motion seeking new jury instructions to the effect that Vakilian was not required to prove the ethnicity of Drs. Beasley and Eos and that discrimination could be based on perceived ethnicity, regardless actual ethnicity. Before the judge had an opportunity to read the motion, the jury returned a verdict in favor of Shaw.

## II.  ANALYSIS

### A.     Motion to reinstate Fourth Amendment claim

Vakilian appeals the denial of his motion to reinstate his Fourth Amendment claims. Vakilian's motion asked the district court to grant relief from this Court's decision in *Vakilian I* based on "new" evidence as well as alleged misrepresentations made to the Sixth Circuit during oral argument in *Vakilian I*. Although the mandate rule requires a district court to adhere to the decisions of the court of appeals within a given case, there are limited exceptions that allow the district court to reopen an issue decided on appeal. *See Mitchell v. Rees*, 261 F. App'x 825, 828 (6th Cir. 2008) (relief from court of appeals mandate may be granted where "substantially different evidence [is] raised on subsequent trial" (internal quotation marks omitted)). We construe the motion as one under Federal Rule of Civil Procedure 60(b) for relief from a final order, *see, e.g.*, *id.*, and therefore

apply an abuse of discretion standard. *See Futernick v. Sumpter Twp.*, 207 F.3d 305, 313 (6th Cir. 2000); *see also McCormick v. City of Chicago*, 230 F.3d 319, 326-27 (7th Cir. 2000) (reviewing denial of motion to reinstate claim for abuse of discretion).

Vakilian's argument for reinstatement is meritless because the new facts and fraudulent representations he alleges do nothing to alter this Court's prior ruling on this very issue. In *Vakilian I*, we explained that to overcome Shaw's entitlement to qualified immunity, Vakilian was required to establish: (1) a substantial showing that Shaw stated a deliberate falsehood or showed reckless disregard for the truth, and (2) that the allegedly false or omitted information was material to the finding of probable cause. *Vakilian I*, 335 F.3d at 517. We assumed, for the sake of argument, that Vakilian had made a showing that Shaw lied in his testimony in support of the warrant request when he stated that Vakilian knew of the illegal kickback scheme. *Id*. at 518. We went on to find that under Michigan law at the time the warrant was obtained, the MFCA contained no requirement of knowledge that the kickback being received was in fact a kickback—rather, it simply required a showing that the defendant received a kickback. Therefore, all of the "new" statements showing that Defendants *believed* they were required to show knowledge of the kickback scheme are immaterial, as are the comments of Defendants' counsel at oral argument discussing what Defendants believed at the time they obtained the warrant. *Id*. Under law-of-the-case doctrine, both the district court and we are precluded from revisiting our prior holding, and the district court did not abuse its discretion in denying Vakilian's motion to reinstate his Fourth Amendment claim. *See McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 n.3 (6th Cir. 2000) (law of the case is binding absent substantially different evidence, a change in controlling law, or clear error and manifest injustice).

11

**B.     Absolute prosecutorial immunity**

The district court granted summary judgment for Koenigsknecht based on absolute prosecutorial immunity.  In *Vakilian I*, we affirmed summary judgment as to the § 1983 claim but declined to exercise pendent jurisdiction as to the § 1985(3) claim.  For the reasons stated in the preceding section, Vakilian does not have a § 1983 claim against Koenigsknecht.  We review the grant of absolute immunity to Koenigsknecht only with respect to the § 1985(3) claim.

*1.  Standard of review*

A denial of a motion for reconsideration of a grant of summary judgment is reviewed de novo.  *Hansmann v. Fid. Invs. Inst. Servs. Co.*, 326 F.3d 760, 766-67 (6th Cir. 2003).  Defendants claim that Vakilian is appealing not the grant of summary judgment to Koenigsknecht, but the denial of his post-trial motion for reinstatement of claims based on evidence adduced at trial.  Defendants claim this denial is subject to abuse-of-discretion review as to factual determinations and de novo review only as to legal determinations.  We construe Vakilian's appeal as challenging the grant of summary judgment to Koenigsknecht and therefore review it de novo.  *See Cattin v. Gen. Motors Corp.*, 955 F.2d 416, 428 (6th Cir. 1992) ("[A]n appeal from a final judgment draws into question all prior non-final rulings and orders [including grants of partial summary judgment].").

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing the absence of any genuine issues of material fact.  *Plant v. Morton Int'l, Inc.*,

212 F.3d 929, 934 (6th Cir. 2000). Once the movant has satisfied its burden, the nonmoving party must produce evidence showing that a genuine issue remains. *Id.* We will take into account all evidence adduced by the parties in determining whether a genuine issue of material fact exists.

### 2. Merits

Prosecutors generally enjoy absolute immunity for acts taken "in initiating a prosecution and in presenting the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1975). We use a "functional" approach to determine when absolute immunity applies, looking to "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White*, 484 U.S. 219, 229 (1988). "Searching for clues and corroboration that might give [the prosecutor] probable cause to recommend that a suspect be arrested" is not protected by absolute immunity, but "the professional evaluation of the evidence assembled by the police" is so protected. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (internal quotation marks omitted). "Absolute prosecutorial immunity will attach to administrative or investigative acts necessary for a prosecutor to initiate or maintain a criminal prosecution." *Ireland v. Tunis*, 113 F.3d 1435, 1446-47 (6th Cir. 1997). "The decision to file a criminal complaint and seek issuance of an arrest warrant are quasi-judicial duties involved in initiating a prosecution" and are protected by absolute immunity. *Id.* (internal quotation marks omitted).

This case is governed by *Ireland v. Tunis*, a § 1983 case involving a claim of prosecution without probable cause, in which a prosecutor was granted absolute immunity where he received informal reports on the status of the investigation, attended staff meetings, concurred in the recommendations of subordinates that charges be filed, and concurred in the decision to seek an

arrest warrant. 113 F.3d at 1444. Koenigsknecht is plainly entitled to absolute immunity for the bulk of his acts, including staying informed of the investigation's progress, reviewing Shaw's draft arrest warrant, and deciding which suspects to charge. Koenigsknecht's interview of Dr. Beasley comes closer to the line between core prosecutorial functions and investigatory functions that are not "intimately associated with the judicial phase of the criminal process." Because Vakilian has failed to produce evidence to counter Koenigsknecht's statement that his purpose in interviewing Dr. Beasley was to determine whether to use her as a cooperating witness, Vakilian has not raised a genuine issue of material fact as to whether Koenigsknecht stepped outside his protected role as an advocate for the state in the judicial process. Furthermore, Vakilian's § 1985(3) claim is not based on Koenigsknecht's conduct at his interview with Beasley, but on Koenigsknecht's "decision to seek to seek issuance of an arrest warrant" for Vakilian—this is a core prosecutorial decision as to which Koenigsknecht is entitled to absolute immunity. *Ireland v. Tunis*, 113 F.3d at 1446.

## C. Jury Instruction

Under the Federal Rules of Civil Procedure, the parties must be given an opportunity to object to the jury instructions before they are delivered to the jury, and if a party fails to object, the instructions are reviewed for "plain error . . . if the error affects substantial rights." Fed. R. Civ. P. 51(b)(2), (d)(2). An objection to a jury instruction must "stat[e] distinctly the matter objected to and the grounds for the objection" and must be made on the record. Fed. R. Civ. P. 51(c)(1).

Vakilian did not object to the jury instruction which he now disputes. In fact, the disputed instruction consisted of language proposed by Vakilian's attorney. The judge gave both sides an opportunity to express concerns regarding the instruction, and neither of them did so. Because

Vakilian cannot make a colorable argument that the complained of instruction was plainly erroneous or that it affected his substantial rights, he is not entitled to a new trial.

Vakilian's other challenges to the jury instructions are also meritless. Vakilian argues that the jury was not instructed that perceived ethnicity could be a basis for discrimination, but nothing in the jury instructions forbade the jury from using such perceptions to find Shaw liable. The instructions on the equal protection claim merely required the jury to determine whether Vakilian had been discriminated against because of his status as a foreign-born individual. This instruction allowed the jury to find for Vakilian if they believed he had been targeted because Shaw perceived him as different from Drs. Eos and Beasley. Vakilian's arguments regarding burden-shifting carry no weight. The court correctly explained Vakilian's burden, and Vakilian never requested a *McDonnell Douglas* burden-shifting instruction so cannot complain that one was not given. *See* Fed. R. Civ. P. 51(d)(1)(B).

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgments of the district court in full.